## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

IN RE:  

**ALEIDA C. NUNEZ,**

    **Debtor.**

_____/

CASE NO.: **17-bk-21018-LMI**
**CHAPTER 13**

## MEMORANDUM OF LAW IN SUPPORT OF RESPONSE TO OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN

Reverse Mortgage Solutions, Inc. ("Secured Creditor"), by its undersigned counsel, files this brief in support of its Objection to Confirmation of Debtor's Chapter 13 Plan and Amended Chapter 13 Plan and states as follows:

## STATEMENT OF FACTS

Secured Creditor holds a security interest in the real property located at 9940 SW 155 Avenue, Miami, FL 33196 ("Property"), by virtue of a Home Equity Conversion Mortgage ("Mortgage"), executed on June 24, 2008 and recorded on July 14, 2008 in Book 26476, at Page 3178, of the Public Records of Miami-Dade County, Florida. The Mortgage was executed by Ms. Olga Nunez and her daughter, Aleida C Nunez ("Debtor") in favor of World Alliance Financial Corp. for the property listed above. That same day, Olga Nunez ("Borrower") also executed both a Home Equity Conversion Note ("Note") and Home Equity Conversion Loan Agreement ("Loan Agreement") in favor of World Alliance Financial Corp.

The term "Borrower" is defined in the Note as "each person signing at the end of this Note". *See* p. 1, ¶ 1, Exhibit B. Olga Nunez was the only person who signed at the end of the Note, and, thus, the only "Borrower." *Id.* at p. 3. The term "Borrower" is defined in the Loan Agreement as Olga Nunez and, thus, Olga Nunez is the only "Borrower". *See* p. 6, Exhibit C.

The Mortgage contains two signature lines for witnesses, and two additional signature lines signed by Olga Nunez and Debtor, Aleida C Nunez. *See* p. 7, Exhibit A.  Below Debtor's signature line is typed the word "Remainderman."[1] *Id.*  The Mortgage states that "Borrower has agreed to repay to Lender amounts which Lender is obligated to advance" under the terms of the Loan Agreement and that "[t]he agreement to repay is evidence by Borrower's Note" – the "Borrower" referenced clearly being Olga Nunez. *Id.* at p. 1.



Debtor signed the Mortgage as a "Remainderman" because she was a holder of the future interest to the property owned by her mother, and therefore required to sign the Mortgage relinquishing her remainder in the property. The U.S. Department of Housing and Urban Development's ("HUD") Mortgagee Letter 1997-15 states in relevant part that:

> Regulatory changes permit mortgages to be insured and remain in force even if no eligible mortgagor has any interest in the property greater than a life estate. **If an eligible mortgagor holds only a life estate when the mortgage is executed, all holders of any future interest in the property (remainder or reversion) will also be required to execute the mortgage to ensure that the mortgage is secured by a fee simple interest.** A holder of a future interest does not execute the note or loan agreement and does not have the rights to loan proceeds of other mortgagors.

---

[1] As the Court is aware, a remainderman is "[s]omeone who holds or is entitled to receive a remainder." Black's Law Dictionary (10th ed. 2014.

*See ML 1997-15*, ¶ 6 (emphasis added).

Here, the Debtor initially acquired title to the subject property by virtue of a 2005 Quit Claim Deed (the "2005 QCD") and was listed as a joint owner of the subject property with her mother, Olga Nunez. Together, they held the property as tenants in common due to the fact the deed was silent as to survivorship rights. On June 24, 2008, the same day the Note and Mortgage were executed, Debtor and Borrower executed another Quit Claim Deed (the "2008 QCD") which granted Borrower a life estate interest in the property and granted Debtor a remainder interest in the property. The 2008 QCD was recorded on July 3, 2008 in Book 26463, at Page 3178, of the Public Records of Miami-Dade County, Florida. Accordingly, under HUD's Mortgagee Letter 1997-15, Debtor's signature on the Mortgage as to her remainder interest was necessary for the lender to secure a fee simple interest.

Thus, it is clear that the parties intended Debtor to execute the Mortgage not as a "Borrower," but solely to encumber her remainder interest in the Property to the lien of the Mortgage and thereby ensure that the Mortgage was secured by a fee simple interest, consistent with the requirements applicable to the loan under HUD's Mortgagee Letter 1997-15.

The Mortgage further indicates that the lender may accelerate the full amount due and owing if "[a] Borrower dies and the Property is not the principal residence of at least one surviving Borrower." *See* p. 3, ¶ 9, Exhibit A. On June 23, 2016, Olga Nunez passed away. A copy of the Florida Certificate of Death is attached hereto as Exhibit D. The Florida Certificate of Death states that the informant's name is "Aleida Nunez" *See* Exhibit D. It also indicates that her relationship to Olga Nunez is "Daughter". *Id.*

On September 5, 2015, Secured Creditor filed its Verified Complaint ("Complaint") based pursuant to Paragraph 9(b)(iii) of the Mortgage due to the failure of the Borrower to maintain taxes

and insurance. The Complaint was later amended to include Borrower's death as an additional basis of default under the terms of the Mortgage and Note. The foreclosure lawsuit is currently pending in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 2015-020314-CA-01.

Debtor filed a voluntary petition pursuant to Chapter 13 of the Bankruptcy Code on August 30, 2017, which has stayed the foreclosure lawsuit.  On January 3, 2018, Secured Creditor filed a Total Debt Amended Proof of Claim ("Claim No. 3-2") with the total secured claim due and owing in the amount of $390,671.74.  Debtor has proposed an Amended Chapter 13 Plan to cure pre-petition arrearages for the default on taxes and insurance and has objected to Secured Creditor's Claim No. 3-2 and is seeking to decelerate the default under the loan as a "borrower" under the terms of the Note and Mortgage rather than pay the entire total debt amount as an heir.

## MEMORANDUM OF LAW

### I.  Debtor is not a "Borrower" under the Reverse Mortgage

The Note and Mortgage give the lender the right to require immediate payment in full if "[a] Borrower dies and the Property is not the principal residence of at least one surviving Borrower." *See* p. 3, ¶ 9, Exhibit A.   Applying the basic principles of contract law, it is clear that Olga Nunez was the only "Borrower" under this provision. Thus, there has been a default under the terms of the note and mortgage.

Under Florida law, mortgages are subject to the same rules of construction and interpretation that apply to contracts generally. *See* 37 Fla. Jur. 2d *Mortgages, Etc. §93.*  Thus, as with any other contract, "[t]he primary rule of construction of a mortgage is to ascertain the intention of the parties." *Sardon Found. v. New Horizons Serv. Dogs, Inc.,* 852 So. 2d 416, 420 (Fla. 5th DCA 2003); *see L&H Const. Co., Inc. v. Circle Redmont, Inc.,* 55 So. 3d 630, 634 (Fla.

5th DCA 2011) ("It is well-established that the parties' intent governs contract construction and interpretation.").

To ascertain the parties' intent, "the trial court must examine the whole instrument, not isolated parts." *L&H Const. Co.,* 55 So. 3d at 634. Words and clauses must be read in context of the entire contract and construed in connection with other provisions. *Hand v. Grow Const., Inc.* 983 So. 2d 684, 687 (Fla. 1st DCA 2008). Similarly, documents executed at or near the same time, and as part of the same transaction must be read and construed together. *See Citicorp Real Estate, Inc. v. Ameripalms 6B GP, Inc.,* 633 So. 2d 47, 49 (Fla. 3d DCA 1994); *see e.g. Woodard v. Synovus Bank of Tampa Bay (In re Alford),* 403 B.R. 123, 132 (Bankr. M.D. Fla. 2009) ("the Loan Documents must be interpreted as a whole"); *MV Ins. Consultants v. NAFH Nat. Bank,* 87 So.3d 96, 99 (Fla. 3d DCA 2012) (construing "all of the relevant loan documents as a single contract" to determine parties' intent).

### A.  Contract Construction.

The Mortgage identifies the "Borrower" as "Olga Nunez a/k/a Olga E Nunez, a single woman, as to the Life Estate interest and Aleida C Nunez, a single woman as to the remainder, whose address is 9940 Southwest 155th Avenue, Miami, FL 33196 ("Borrower"). *See* p. 1, ¶ 1, Exhibit A. After identifying "Borrower" on the first page, the Mortgage uses the term in the singular tense to refer to Olga Nunez alone, stating, for example, that "Borrower has agreed to repay to Lender amounts which Lender is obligated to advance" under the Loan Agreement, and that "[t]he agreement to repay is evidence by Borrower's Note"—the "Borrower" on the Note and Loan Agreement indisputably being Olga Nunez. Like the Note, the Mortgage provides that the lender require repayment when the "Borrower" dies and the Property is not the principal residence

of any surviving Borrower. *See* p. 3 ¶ 9(a)(i), Exhibit A.  With Olga Nunez as the sole "Borrower," this provision is consistent with the repayment terms in the Note.

While there is no dispute that Debtor also signed the Mortgage, it identified her capacity as "Remainderman" via pre-printed text next to her name and the Mortgage recites the then current vesting of the property as the "Borrower," the signature line and introductory clause must be read in the context of the entire agreement.  *See e.g. Alamo Fin., L.P. v. Mazoff,* 112 So. 3d 626, 630 (Fla. 4th DCA 2013) (rejecting one party's interpretation as "substantively unreasonable" because it ignored "the well-established principle that 'the intention of the parties must be determined from an examination of the entire contract and not from separate phrases or paragraphs'" (citation omitted)).  When read in context, the only reasonable interpretation of paragraph 9 of the Mortgage is that the lender is entitled to require immediate payment in full if Olga Nunez, the sole "Borrower," passes away. *See* p. 3 ¶ 9(a)(i), Exhibit A.

Both Olga Nunez and Debtor executed the Mortgage.  However, Debtor signed only in her capacity as "Remainderman", as indicated by the typed word, "Remainderman" next to her name. *Id.* at 7.  This is distinct and separate from the signature line of Olga Nunez.  Furthermore, Debtor was not defined as a "Borrower" on the Note and did not sign the Mortgage as "Borrower".  *Id; see generally* Exh. B.  In *SCG Harbourwood, LLC v. Hanyan*, the 2nd DCA held that "the intent of the parties is discerned from the total writing and not particular provisions or disjointed sentence of a contract should not be construed alone. 93 So. 3d 1197, 1200 (Fla 2d 2012).  The Mortgage repeatedly refers to a singular "borrower" rather than "borrowers".  Additionally, Debtor signed the last page of the Mortgage as "Remainderman" rather than borrower, which is distinct and separate from the signature line of borrower, Olga Nunez. As clear from the documents when read as a whole, Debtor is not a Borrower under the terms of the note and mortgage.

B.  **Documents Executed Contemporaneously Must be Construed Together.**

Applied specifically in the mortgage context, "the rule is that where other instruments are executed contemporaneously with a mortgage and are part of the same transaction, a mortgage may be modified by all other instruments and all the documents are to be read together to determine and give effect to the intention of the parties." *Boyette. V. Carden,* 347 So. 2d 759, 761 (Fla. 1st DCA 1977); *see Graham v. Fitts,* 43 So. 512 (Fla. 1907) ("Where a note evidencing a debt and a mortgage to secure its payment are executed at the same time in one transaction, and the mortgage refers to the note, they should be considered together in determining their meaning and effect.").

To determine the parties' intent in the instant case, the Court must also construe together all the loan documents executed by the parties at the same time on the same transaction.  Here, the parties executed (1) a Note defining "Borrower" as Olga Nunez—and only Olga Nunez signed the documents; (2) a Loan Application completed and executed by Olga Nunez alone; the "Co-Borrower" sections of the Loan application were blank; (3) a Mortgage where Debtor signed as "Remainderman"; (4) a Loan Agreement defining "Borrower" as Olga Nunez—and only Olga Nunez signed the documents.

These documents must therefore be considered together to determine their meaning and effect. *See e.g. Sardon Found.,* 852 So. 2d at 420 (concluding the trial court erred in failing to consider the terms of an additional agreement, along with the mortgage and note, to ascertain the intentions of the parties to the transaction); *Dodge City, Inc. v. Byrne,* 693 So. 2d 1033, 1034 (Fla. 2d DCA 1997) (holding that trial court erred in failing to consider "several documents executed simultaneously with the retail installment contract").  Reading these documents together and reading the acceleration provision in context, the parties' intent is manifest- Olga Nunez was the only "Borrower" and the loan became due and payable upon the death of Olga Nunez.

### C.  Debtor Ineligible to be Reverse Mortgage Borrower under Regulations.

Debtor, daughter of Olga Nunez, is not a borrower under the terms of the Note, Mortgage, or Loan Agreement.  Debtor signed the Mortgage so that the mortgage secured a fee simple interest.  Again, the Debtor did not execute the Note, Loan Agreement, Residential Loan Application, HUD/VA Addendum to Uniform Residential Loan Application, nor Settlement Statement.  *See* Composite Exhibit E.  Additionally, Debtor was not a "Borrower" as she was ineligible to sign the Mortgage as a "Borrower" due to her inability to meet the requirements to be a reverse mortgage borrower.

Reverse mortgages offered under the Home Equity Conversion program, like the mortgage in this case, are insured by the Federal Housing Administration (FHA).  12 U.S.C. §1715z-20(a) sets forth the purpose of the insurance on reverse mortgages, which is designed "to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing, and subsistence needs at the time of reduced income". 12 U.S.C. §1715z further sets forth requirements of the reverse mortgages to ensure their purpose is carried out.  The requirements include, but are not limited to the, requirements that each Borrower ***must*** be 1) sixty two (62) years of age or older at the time of loan closing (24 C.F.R. §206.33); 2) be on title to the property (24 C.F.R. §206.35); 3) reverse mortgage must be in first lien position (24 C.F.R. §206.8);  4) the property must be used as the primary residence of each borrower(s) at the time of closing and throughout the life of the loan (24 C.F.R. §206.39); 5) the borrower(s) must remain current on real estate taxes, homeowners insurance, and other mandatory obligations, such as homeowners association or condominium fees (24 C.F.R. §206.205).

In the present case, Debtor did not meet the age requirement to be a "Borrower" at origination.   Upon information and belief, the Debtor was only approximately 56 years of age at

the time of execution of the mortgage documents.  Additionally, Debtor did not meet the title requirements at origination as title was not vested to her. At origination, Debtor only had a future interest, and did not have title to the property under the 2008 deed. The Debtor quit-claimed her tenants in common interest in the entire property by granting a life estate interest to her deceased mother, Olga Nunez, prior to execution of the loan documents and retaining only a future, remainder interest in the subject property. Death of Olga Nunez was a condition precedent to Debtor's ownership interest. The fact that the Debtor did not hold title nor had a current, possessory interest in the property at the time the mortgage was executed immediately disqualified her from being considered a Borrower for purposes of the reverse mortgage. The 2008 Deed was evidently executed on the date of the reverse mortgage in order for the Borrower, Olga Nunez, to qualify for the reverse mortgage. Therefore, the Debtor is ineligible to be a reverse mortgage borrower under applicable federal law.

## II. *Edwards and Smith* are Distinguishable as Debtor is not a Spouse of Borrower

Debtor argues that she is a "borrower" under the terms of the Mortgage pursuant to *Smith,* 200 So. 3d 221 (Fla. 3d DCA 2016) and *Edwards v. Reverse Mortgage Solutions, Inc.*, 187 So. 3d 895 (Fla. 3d DCA 2016).  However, *Smith* and *Edwards* are distinguishable on their facts.

In *Smith,* the appellant Celia Smith signed a reverse mortgage with her now-deceased husband, Kenneth Smith.  *Smith,* 200 So. 3d at 223.  The mortgage encumbered the property "where Mr. and Mrs. Smith lived together as their principal residence." *Id.*  Mrs. Smith did not sign the promissory note. *Id.* At 222.  Upon the death of Mr. Smith, the appellee accelerated the debt as it alleged the sole borrower had passed away. *Id.* at 223.  In concluding that acceleration was improper because Mrs. Smith was a co-borrower under the mortgage, the Third District Court of Appeal focused on the language in the mortgage identifying Mr. Smith as "a married man." *Id.*

at 226.  Specifically, it noted that the federal law relating to reverse mortgages defined the term "homeowner" as including the homeowner's <u>spouse.</u> *Id.* (emphasis supplied).  The Third District Court of Appeal felt "compelled to construe a contract consist with specific statutes that regulate and govern the contract." *Id.* at 227 (citations omitted).

Similarly, in *Edwards,* the appellant Johnnie Mae Edwards signed a reverse mortgage with her now-deceased husband, Willie Edwards.  Ed*wards*, 187 So. 3d at 896.  Mrs. Edwards did not sign the promissory note. *Id.*  Upon the death of Mr. Edwards, the appellee accelerated the debt. *Id.*  The lower court found in favor of the appellee because it reasoned Mr. Edwards was the only borrower. *Id.*  The Third District Court of Appeal reversed because it found Ms. Edwards to be a co-borrower as the surviving spouse.  *Id.*  In reaching that determination, it noted that, as in *Smith,* this holding was consistent with the federal law defining "homeowner" as including the homeowner's <u>spouse.</u> *Id.* at 879 (emphasis supplied; citations omitted).

The instant case, by contrast, does not concern the surviving spouse of Olga Nunez.  The Mortgage states that Olga Nunez is a single woman and Debtor, her daughter, is a single woman. Moreover, Debtor was too young to qualify for a reverse mortgage and did not meet the title requirements to be a Borrower. Also, the death certificate confirms that Debtor is the daughter of Olga Nunez.  Since Debtor is not a spouse of the Borrower, the federal law defining "homeowner" and including the homeowner's spouse would not protect Debtor. As such, Olga Nunez and Debtor were not married, did not own the property in entirety, and the other factors employed in *Smith* and *Edwards* are wholly inapplicable here.

The instant case at bar is further distinguishable from *Smith* and *Edwards* because the signature block in the Mortgage confirms that Debtor signed in her capacity as "Remainderman". By contrast, Olga Nunez signed as a "Borrower" as opposed to *Smith* and *Edwards,* in which the

Court relied upon the fact the non-borrower spouse executed the last page in the reverse mortgage as a "Borrower."

In *Reverse Mortgage Solutions, Inc. v. Eady,* 01-2014-CA-004485 (Fla. 8th Circ. Ct. 2017), the Court considered the multiple closing documents to establish the Defendant was not a "borrower" for purposes of Paragraph 9 of the Mortgage as well as the fact the Defendant was not even qualified to be considered a borrower under the requirements for qualification at the time the mortgage was executed.

Similar to *Eady,* the Debtor here cannot be considered a borrower as she was not eligible for a reverse mortgage at the time the Note and Mortgage were executed. Each borrower must be at least sixty-two (62) years of age at the time of execution of the mortgage documents. Again, upon information and belief, the Debtor was only approximately 56 years of age at the time of execution of the mortgage documents. *See* 24 C.F.R. §206.33. Additionally, the multiple other closing documents, including the Residential Loan Application, Settlement Statement, Truth-in-Lending Disclosure Statement, and Credit Counseling Certificate clearly reflect Olga Sanchez was the only intended "borrower" under the terms of the loan. *See* Composite Exhibit E.

A similar analysis was taken by the Fourth District Court of appeals in *Nationstar Mortgage Company d/b/a Champion Mortgage Company v. Levine,* 216 So. 3d 711 ((Fla. 4d DCA 2017), in which the appellate court reversed and remanded the trial court's summary judgment order entered in favor of the defendant due to a patent ambiguity in the contract. In *Levine,* Mr. Levine executed an adjustable-rate home equity conversion note in favor of the lender. *Id.* at 713. Mr. Levine and Mrs. Levine both executed the adjustable-rate home equity conversion mortgage. *Id.* The beginning of the reverse mortgage contained language that indicated, "[t]he mortgagor is Julian C. Levine, **joined by his wife, Mary E. Levine** … ("**Borrower**")." *Id.* The bottom of the

reverse mortgage contained two signature lines in the borrower section, however, underneath Mrs. Levine's signature line contained the pre-printed text, "Mary E. Levine, **Non-Borrowing Spouse**." *Id.* A foreclosure action was commenced by the lender after the death of Mr. Levine and Mrs. Levine sought summary judgment based upon the argument she executed the mortgage as a "Borrower." *Id.* at 714. The appellate court reversed the summary judgment order and remanded the case back to the trial court due to the fact that although Mrs. Levine's name appeared on the first page of the mortgage next to the word "Borrower," there was a genuine issue of material fact as to whether she was indeed a "borrower" as defined in the mortgage due to the specific identifiable signature as a "non-borrowing spouse." *Id* at 716.

### III. Congressional Intent to Protect Spouses

As stated above, reverse mortgages offered under home equity conversion program are insured by the FHA. 12 U.S.C. §1715z-20(a) sets forth the purpose of the insurance on reverse mortgages, which is designed "to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing, and subsistence needs at the time of reduced income". Furthermore, 12 U.S.C. §1715z-20(j) states:

> Safeguard to prevent displacement of homeowner: the Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death . . . [f]or the purposes of this subsection, the term "homeowner" includes the spouse of a homeowner.

First and foremost, this law speaks to insurability and whether or not HUD can insure a loan that does not provide for the above-references provisions. This is separate than a contractual requirements between a mortgagor and mortgagee. The law appears clear that 12 U.S.C. § 1715z-

20(j) was created in an effort to protect a non-borrowing spouse (not an heir) from acceleration of the reverse mortgage and any legal action related thereto such as foreclosure by restricting the insurance potential on loans that violate the terms of the act.   Additionally, nothing in the language mentions a non-spousal remainderman, daughter, or other heirs, but rather is specifically limits displacement to a spouse.

The congressional intent is clear that 12 U.S.C. § 1715z-20(j) was designed in an effort to protect homeowner/spouses from being displaced at the time of death of one spouse on a reverse mortgage.  Nothing in the statute or case law indicates Congress had any intention of protecting an interest held by an heir or non-spousal remainder that was not qualified to be a borrower under the terms of a reverse mortgage pursuant to statute.  If this were true, arguably speaking, the protection would be endless – the heir of Borrower would be protected, along with their heirs.

## IV.    Debtor should not be considered a borrower for purposes of plan treatment

11 U.S.C. § 1325(a)(5)(A) states "[e]xcept as provided for in subsection (b), the court shall confirm a plan if- (5) with respect to each allowed secured claim provided for in the plan- (A) the holder of such claim has accepted the plan;…"    Reverse Mortgage Solutions, Inc. filed an Objection to the Confirmation of the Chapter 13 Plan (Docket no. 19) on October 16, 2017.  The basis for the objection to the confirmation of the chapter 13 and amended chapter 13 plans filed herein is that the plans do not treat the proof of claim in full.   The subsequent amended Chapter 13 plan (Docket no. 22) has failed to cure Reverse Mortgage Solutions, Inc.'s objection to the Chapter 13 plan therefore pursuant to 11 U.S.C. §1325 (a)(5)(A), the chapter 13 plan  (Docket no. 7) and the amended chapter 13 plan (Docket no. 22) cannot be confirmed.

11 U.S.C. § 1325(a)(6) states "[e]xcept as provided for in subsection (b), the court shall confirm a plan if (6) the debtor will be able to make all plan payments under the plan and to comply

with the plan."  Based upon the "total debt" proof of claim (claim no. 3) on November 13, 2017 in the amount of $390,671.74 (as of the date of the filing of the chapter 13 bankruptcy case) filed by Reverse Mortgage Solutions, Inc., the Debtor would have to make a monthly plan payment of approximately $6,511.20 a month for 60 months, which does not include interest per *In re Till, 301 F.3d 583* (2004).  In addition, the Debtor would be required to pay the taxes and insurance on the property.  The Debtor's schedules I and J, filed herein on November 28, 2016, indicate the Debtor's excess monthly income is $601.26.  The Debtor's amended Chapter 13 Plan (Docket no. 22) proposes to pay $105.83.00 a month for the first 5 months, and $535.83 a month for the remaining 55 months of the plan.  Based upon the Debtor's excess monthly income of $601.26 a month to be put toward a chapter 13 plan payment, the chapter 13 plan (Docket no. 7) and the amended chapter 13 plan (Docket no. 22) are not feasible and do not satisfy the requirement of 11 U.S.C. §1325 (a)(6) therefore none of the chapter 13 plans can be confirmed.

Reverse Mortgage Solutions, Inc.  does note in their objection that the option of paying the entire loan balance in full through the bankruptcy is a viable option pending the parties agreement of the treatment of the loan through the chapter 13 plan pursuant to 11 U.S.C. § 1322 (c)(2).

It is well settled that 11 U.S.C. § 1322(b)(2) of the Bankruptcy Code, known as the anti-modification clause, provides that a Chapter 13 plan  may "modify the rights of holders of secured claims, *other than* a claim secured only by a security interest in real property that is the debtor's principal residence."  (Emphasis added).  Bankruptcy Courts have utilized 11 U.S.C. § 1322(c)(2) to carve out an exception to the 1322(b)(2) anti-modification provision in the context of reverse mortgages to allow for non-borrowing debtors under the terms of a reverse mortgage to modify the mortgage on the debtor's principal residence by proposing to pay the creditor the full value of its collateral over the course of the bankruptcy due to the fact the loan had matured or was set to

mature before the date on which the final payment under the Chapter 13 plan was due.  *In Re Griffin*, *489 B.R. 638, 642-43 (Bankr. Md. 2013; In Re Gray, 530 B.R. 501 (Bankr. S.D. Fla. 2015); In Re Harmon, 2015 WL 8249995 (Bankr. M.D. Fla. Dec. 2, 2015)*.

There is no existing case law that allows for a non-borrower (as the Debtor here) to modify the terms of a reverse mortgage by curing an existing default and decelerating the loan as this would be an explicit contradiction to the anti-modification provisions of 11 U.S.C. § 1322(b)(2). As a result, Debtor's Objection to Claim No. 3-2 of Secured Creditor should be denied and Debtor required to amend the plan to conform to the total debt amount in Claim No. 3-2 as a non-borrower heir or provide for the surrender the property.

## **CONCLUSION**

The Debtor's reliance upon the court rulings in *Smith* and *Edwards* is misguided.  In these cases, the Defendants (surviving spouses of the individuals who signed a reverse mortgage), executed the mortgage as a "Borrower" and were required to execute the mortgage documents as a spouse of the borrower in accordance with Florida Homestead Provisions and those Courts construed that the non-borrowing spouses were protected under Congress' expanded definition of a homeowner, which expanded to include the spouse of a homeowner under 12 U.S.C. § 1715z-20.  Despite Debtor's assertions to the contrary, the Debtor is not and was never a "borrower" under the express terms of the loan documents.  The Debtor executed multiple documents that are expressly contrary to the assertion that she is a "borrower" on the loan.  Debtor's Objection to Claim No. 3-2 should be denied and confirmation denied and Debtor required to amend the Chapter 13 Plan to provide for an appropriate treatment of Secured Creditor's claim in its entirety as a non-borrower heir.

Respectfully Submitted,

Robertson, Anschutz & Schneid, P.L.
Attorneys for Secured Creditor
6409 Congress Ave., Suite 100
Boca Raton, FL 33487
Telephone: 561-241-6901
Facsimile: 561-997-6909

By: /s/ Christopher P. Salamone
Christopher P. Salamone, Esquire
Bar Number 75951
Email: csalamone@rasflaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on January 29th, 2018, I electronically filed the foregoing

with the Clerk of Court by using the CM/ECF system, and a true and correct copy has been served

via CM/ECF or United States Mail to the following parties:

**Aleida C. Nunez**
9940 SW 155th Avenue
Miami, FL 33196

**Gianny Blanco**
10647 N kendall Dr
Miami, FL 33176

**Edward Freire**
10647 N Kendall Drive
Miami, FL 33176

**Nancy K. Neidich**
www.ch13miami.com
POB 279806
Miramar, FL 33027

**Office of the US Trustee**
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130

Respectfully Submitted,

Robertson, Anschutz & Schneid, P.L.
Attorneys for Secured Creditor
6409 Congress Ave., Suite 100
Boca Raton, FL 33487
Telephone: 561-241-6901
Facsimile: 561-997-6909

By: /s/ Christopher P. Salamone
Christopher P. Salamone, Esquire
Bar Number 75951
Email: csalamone@rasflaw.com

# EXHIBIT A



OR Bk 26476 Pgs 3178 - 3186; (9pgs)
RECORDED 07/14/2008 12:10:27
MTG DOC TAX 1,858.50
INTANG TAX 1,062.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

**Requested by and returned to:**
World Alliance Financial Corp.
3 Huntington Quadrangle, 3rd Floor
Melville, NY 11747

**FHA Case Number:** ███████████████

State of Florida

# ADJUSTABLE RATE
## HOME EQUITY CONVERSION MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on **June 24, 2008**. The mortgagor is **Olga Nunez a/k/a Olga E Nunez, a single woman, as to Life Estate interest and Aleida C Nunez, a single woman, as to the remainder**, whose address is **9940 Southwest 155th Avenue, Miami, FL 33196** ("Borrower"). This Security Instrument is given to **World Alliance Financial Corp.**, which is organized and existing under the laws of the state of **New York**, and whose address is **3 Huntington Quadrangle 3rd Floor, Melville, NY 11747** ("Lender"). Borrower has agreed to repay to Lender amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement to repay is evidenced by Borrower's Note dated the same date as this Security Instrument ("Note"). This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest at a rate subject to adjustment, and all renewals, extensions and modifications of the Note, up to a maximum principal amount **Five Hundred Thirty-One Thousand and 00/100 Dollars ($531,000.00)**; (b) the payment of all other sums, with interest, advanced under Paragraph 5 to protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. The full debt, including all amounts described in (a), (b), and (c) above, if not paid earlier, is due and payable on **February 07, 2070**. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in **Miami-Dade** County, Florida:

The real property located at the address **9940 Southwest 155th Avenue, Miami, FL 33196**, in the county of **Miami-Dade**, state of **FL**, described more fully on Exhibit A attached to this Mortgage.

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Florida 1st Mortgage

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

**1.  Payment of Principal and Interest.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note.

**2.  Payment of Property Charges.**  Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

**3.   Fire, Flood and Other Hazard Insurance.**  Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire.  This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary").   Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary.  All insurance shall be carried with companies approved by Lender.  The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail.  Lender may make proof of loss if not made promptly by Borrower.  Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender, instead of to Borrower and Lender jointly.  Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property and then to the reduction of the indebtedness under the Note and this Security Instrument.  Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**4.   Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument and Borrower (or at least one Borrower, if initially more than one person are Borrowers) and shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument.   "Principal residence" shall have the same meaning as in the Loan Agreement.

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted.  Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the Loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence.  If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to merger in writing.

**5.   Charges to Borrower and Protection of Lender's Rights in the Property.**  Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2.  Borrower shall pay these obligations on time directly to the entity which is owed the payment.  If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.  Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other

covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium ("MIP") as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities ("Servicing Fee") as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph are obligatory and shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

**6. Inspection.** Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property. If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

**7. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation, or other taking of any part of the Property, or for conveyance in place of condemnation shall be paid to Lender. The proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property, and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

    **(a) Due and Payable.** Lender may require immediate payment in full of all sums secured by this Security Instrument if:

        (i)    A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

        (ii)    All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred an no other Borrower retains (a) title to the Property in fee simple, (b) a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower, or (c) a life estate in the Property (or a beneficial interest in a trust with such an interest in the Property).

    **(b) Due and Payable with Secretary Approval.** Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval by an authorized representative of the Secretary, if:

        (i)    The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

        (ii)    For a period of longer than twelve (12) consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

        (iii)    An obligation of the Borrower under this Security Instrument is not performed.

    **(c) Notice to Lender.** Borrower shall notify Lender whenever any of the events listed in subparagraphs (a) and (b) of this Paragraph 9(a)(ii) or (b) occur.

    **(d) Notice to Secretary and Borrower.** Lender shall notify the Secretary and Borrower whenever the loan becomes due and payable under this Paragraph 9(a)(ii) and (b). Lender shall not have the right to commence foreclosure until Borrower

has had thirty (30) days after notice to either:

(i)    Correct the matter which resulted in the Security Instrument coming due and payable; or

(ii)    Pay the balance in full; or

(iii)    Sell the Property for the lesser of the balance or 95% of the appraised value and apply the net proceeds of the sale toward the balance; or

(iv)    Provide the Lender with a deed in lieu of foreclosure.

**(e) Trusts.** Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph 9.

**(f) Mortgage Not Insured.** Borrower agrees that should this Security Instrument and the Note not be eligible for insurance under the National Housing Act within eight (8) months from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to eight (8) months from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. No Deficiency Judgments.** Borrower shall have no personal liability for payment of the debt secured by this Security Instrument. Lender may enforce the debt only through sale of the Property. Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed. If this Security Instrument is assigned to the Secretary upon demand by the Secretary, Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

**11. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full. This right applies even after foreclosure proceedings are instituted. To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment in full. Foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with a foreclosure proceeding shall be added to the principal balance. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if:(i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two (2) years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

**12. First Lien Status**

**(a) Modification.** Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a). If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense. If the title evidence indicates that the Property is not encumbered by any liens (except this Security Instrument, the Second Security Instrument described in Paragraph 13(a) and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute such documents. If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

**(b) Tax Deferral Programs.** Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax

Florida 1ˢᵗ Mortgage

4

deferral are not subordinate to this Security Instrument.

**(c) Prior Liens.** Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within ten (10) days of the giving of notice.

**13. Relationship to Second Security Instrument.**

**(a) Second Security Instrument.** In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, unless otherwise provided by the Secretary, the Secretary has required Borrower to execute a Second Note and Second Security Instrument on the Property.

**(b) Relationship of First and Second Security Instruments.** Payments made by the Secretary shall not be included in the debt under the Note unless:

    (i)     This Security Instrument is assigned to the Secretary; or

    (ii)    The Secretary accepts reimbursement by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments but excluding late charges paid by the Secretary, shall be included in the debt under the Note.

**(c) Effect on Borrower.** Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

    (i)     Be required to pay amounts owed under the Note, or pay any rents and revenues of the Property under Paragraph 19 to Lender or a receiver of the Property, until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note; or

    (ii)    Be obligated to pay interest or shared appreciation under the Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the Note.

**(d) No Duty of the Secretary.** The Secretary has no duty to Lender to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though Lender may be unable to collect amounts owed under the Note because of restrictions in this Paragraph 13.

**14. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**15. Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender. Borrower may not assign any rights or obligations under this Security Instrument or under the Note, except to a trust that meets the requirements of the Secretary. Borrower's covenants and agreements shall be joint and several.

**16. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be

Florida 1ˢᵗ Mortgage

deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

**17. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**18. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**19. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's Notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

**20. Foreclosure Procedure. If Lender requires immediate payment in full under Paragraph 9, Lender may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 20, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**21. Lien Priority.** The full amount secured by this Security Instrument shall have the same priority over any other liens on the Property as if the full amount had been disbursed on the date the initial disbursement was made, regardless of the actual date of any disbursement. The amount secured by this Security Instrument shall include all direct payments by Lender to Borrower and all other loan advances permitted by this Security Instrument for any purpose. This lien priority shall apply notwithstanding any State constitution, law or regulation, except that this lien priority shall not affect the priority of any liens for unpaid State or local governmental unit special assessments or taxes.

**22. Adjustable Rate Feature.** Under the Note, the initial stated interest rate of **Four and 32/100** percent **(4.320%)** which accrues on the unpaid principal balance ("Initial Interest Rate") is subject to change, as described below. When the interest rate changes, the new adjusted interest rate will be applied to the total outstanding principal balance. Each adjustment to the interest rate will be based upon the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year ("Index")plus a margin. The Index is published in the Federal Reserve Bulletin and made available by the United States Treasury Department in Statistical Release H.15(519). If the Index is no longer available, Lender will be required to use any index prescribed by the Department of Housing and Urban Development. The new index will have a historical movement substantially similar to the original index, and the new index and margin will result in an annual percentage rate that is substantially similar to the rate in effect at the time the original index becomes unavailable.

Lender will perform the calculations described below to determine the new adjusted interest rate. The interest rate may change

Florida 1st Mortgage

on **September 1, 2008**, and on the first day of ___ and on that day of each succeeding year, or __X__ the first day of each succeeding month (Change Date) until the loan is repaid in full.

The value of the Index will be determined, using the most recent Index figure available thirty (30) days before the Change Date ("Current Index"). Before each Change Date, the new interest rate will be calculated by adding a margin to the Current Index. The sum of the margin plus the Current Index will be called the "Calculated Interest Rate" for each Change Date. The Calculated Interest Rate will be compared to the interest rate in effect immediately prior to the current Change Date (the "Existing Interest Rate).

> ___      **Annually Adjusting Variable Rate Feature** - The interest rate will never increase or decrease by more than two percentage points (2.0%) on any single Change Date. The interest rate will never be more than five percentage points (5.0%) higher or lower than the initial interest rate stated in Paragraph 2 of this Note.

> __X__    **Monthly Adjusting Variable Rate Feature** - The Calculated Interest Rate will never increase above 14.320%.

The Calculated Interest Rate will be adjusted if necessary to comply with the rate limitation(s) described above and will be in effect until the next Change Date. At any change date, if the Calculated Interest Rate equals the Existing Interest Rate, the interest rate will not change.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees awarded by an appellate court.

**25. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check all riders that are applicable].

| | | | |
|---|---|---|---|
| | Condominium Rider | | PUD Rider |
| | Shared Appreciation Rider | | Other |

  BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses: _Anais Aragon_

_Mike Fernandez_

Signature:

x_Olga E Nunez_
**OLGA NUNEZ**

_____

_Aleida C. Nunez_
**ALEIDA C NUNEZ, AS REMAINDERMAN**

Florida 1st Mortgage

7

**STATE OF FLORIDA**
**COUNTY OF** _DADE_

The foregoing instrument was acknowledged before me this _24_ day of
_June 2008_, by _Olga Nunez & Aleida Nunez_ who is

personally known to me; who has produced _FDL_ as identification

and who did (did not) take an oath.

Notary Public

Name: _Anais Aragon_

NOTARY PUBLIC-STATE OF FLORIDA
Anais Aragon
Commission # DD667512
Expires:   APR. 25, 2011
BONDED THRU ATLANTIC BONDING CO., INC.

Florida 1st Mortgage

8

# Exhibit "A"

**Legal Description for File No.:** █████████

**Lot 20A, in Block 15, of Weitzer Hammocks Homes Section Two Amended, according to the Plat thereof, as recorded in Plat Book 142, at Page 12, of the Public Records of Miami-Dade County, Florida**

# ADJUSTABLE RATE NOTE
## (HOME EQUITY CONVERSION)

STATE OF FL

June 24, 2008

<div style="border: 1px solid black;">

# EXHIBIT B

</div>

**PROPERTY ADDRESS**

**FHA Case Number:** ███████████

**Loan Number:** ██████████

9940 Southwest 155th Avenue
Miami, FL 33196

## 1. DEFINITIONS

"Borrower" means each person signing at the end of this Note. "Lender" means **World Alliance Financial Corp.** and its successors and assigns. "Secretary" means the Secretary of Housing and Urban Development or his or her authorized representatives.

## 2. BORROWER'S PROMISE TO PAY; INTEREST

In return for amounts to be advanced by Lender up to a maximum principal amount of **Five Hundred Thirty-One Thousand and 00/100 Dollars ($531,000.00)**, to or for the benefit of Borrower under the terms of a Home Equity Conversion Loan Agreement dated **June 24, 2008** ("Loan Agreement"), Borrower promises to pay to the order of Lender a principal amount equal to the sum of all Loan Advances made under the Loan Agreement with interest. All amounts advanced by Lender, plus interest, if not paid earlier, are due and payable on **February 07, 2070**. Interest will be charged on unpaid principal at the rate of **Four and 32/100** percent (**4.320%**) per year until the full amount of principal has been paid. The interest rate may change in accordance with Paragraph 5 of this Note. At the end of each month, accrued interest shall be added to and made part of the principal balance as a Loan Advance and shall likewise thereafter bear interest.

## 3. PROMISE TO PAY SECURED

Borrower's promise to pay is secured by a mortgage, deed of trust or similar security instrument that is dated the same date as this Note and called the "Security Instrument." The Security Instrument protects the Lender from losses which might result if Borrower defaults under this Note.

## 4. MANNER OF PAYMENT

### (A) Time
Borrower shall pay all outstanding principal and accrued interest to Lender upon receipt of a notice by Lender requiring immediate payment in full, as provided in Paragraph 7 of this Note.

### (B) Place
Payment shall be made at **3 Huntington Quadrangle 3rd Floor, Melville, NY 11747** or any such other place as Lender may designate in writing by notice to Borrower.

### (C) Limitation of Liability
Borrower shall have no personal liability for payment of the debt. Lender shall enforce the debt only through sale of the Property covered by the Security Instrument ("Property"). If this Note is assigned to the Secretary, the Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of assignment.

## 5. INTEREST RATE CHANGES

### (A) Change Date
The interest rate may change on the first day of **September 1, 2008** and on ___ that day of each succeeding year, or _X_ the first day of each succeeding month. Change Date means each date on which the interest rate could change.

### (B) The Index
Beginning with the first Change Date, the interest rate will be based on an Index. "Index" means the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board.. "Current Index" means the most recent Index figure available 30 days before the Change Date. If the Index (as defined above) is no longer available, Lender will use as a new Index any index prescribed by the Secretary. Lender will give Borrower notice of the new Index.

### (C) Calculation of Interest Rate Changes
Before each Change Date, Lender will calculate a new interest rate by adding a margin of **1.750** percentage points to the Current Index. Subject to the limits stated in Paragraph 5(D) of this Note, this amount will be the new interest rate until the next Change Date.

First Note

1

**(D) Limits on Interest Rate Changes**

___         **Annual**:   The interest rate will never increase or decrease by more than two percentage points (2.0%) on any single Change Date.  The interest rate will never be more than five percentage points (5.0%) higher or lower than the initial interest rate stated in Paragraph 2 of this Note.

  X      **Monthly**: The interest rate will never increase above **14.320%**.

**(E) Notice of Changes**

Lender will give notice to Borrower of any change in the interest rate.  The notice must be given at least 25 days before the new interest rate takes effect, and must set forth (i) the date of the notice, (ii) the Change Date, (iii) the old interest rate, (iv) the new interest rate, (v) the Current Index and the date it was published, (vi) the method of calculating the adjusted interest rate, and (vii) any other information which may be required by law from time to time.

**(F) Effective Date of Changes**

A new interest rate calculated in accordance with Paragraphs 5(C) and 5(D) of this Note will become effective on the Change Date, unless the Change Date occurs less than 25 days after Lender has given the required notice.  If the interest rate calculated in accordance with Paragraphs 5(C) and 5(D) of this Note decreased, but Lender failed to give timely notice of the decrease and applied a higher rate than the rate which should have been stated in a timely notice, then Lender shall recalculate the principal balance owed under this Note so it does not reflect any excessive interest.

**6.  BORROWER'S RIGHT TO PREPAY**

A Borrower receiving monthly payments under the Loan Agreement has the right to pay the debt evidenced by this Note, in whole or in part, without charge or penalty.  Any amount of debt prepaid will first be applied to reduce the principal balance of the Second Note described in Paragraph 11 of this Note and then to reduce the principal balance of this Note.

All prepayments of the principal balance shall be applied by Lender as follows:

First, to that portion of the principal balance representing aggregate payments for mortgage insurance premiums;

Second, to that portion of the principal balance representing aggregate payments for servicing fees;

Third, to that portion of the principal balance representing accrued interest due under the Note; and

Fourth, to the remaining portion of the principal balance.  A Borrower may specify whether a prepayment is to be created to that portion of the principal balance representing monthly payments or the line of credit.  If Borrower does not designate which portion of the principal balance is to be prepaid, Lender shall apply any partial prepayments to an existing line of credit or create a new line of credit.

**7.  IMMEDIATE PAYMENT IN FULL**

**(A) Death or Sale**

Lender may require immediate payment in full of all outstanding principal and accrued interest if:

    (i)        A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

    (ii)      All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains (a) title to the Property in fee simple (b) a leasehold under a lease for less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower (or retaining a beneficial interest in a trust with such an interest in the Property), or (c) a life estate in the Property.

**(B) Other Grounds**

Lender may require immediate payment in full of all outstanding principal and accrued interest, upon approval by an authorized representative of the Secretary, if:

    (i)        The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of a least one other Borrower;

    (ii)      For a period of longer than twelve (12) consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

    (iii)    An obligation of the Borrower under the Security Instrument is not performed.

**(C) Payment of Costs and Expenses**

If Lender has required immediate payment in full, as described above, the debt enforced through sale of the Property may include costs and expenses, including reasonable and customary attorneys' fees, associated with enforcement of this Note to the extent not prohibited by applicable law.  Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of this Note.

First Note

**(D) Trusts**

Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interest in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph.

**8. WAIVERS**

Borrower waives the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**9. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the property address above or at a different address if Borrower has given Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by first class mail to Lender at the address stated in Paragraph 4(B) or at a different address if Borrower is given a notice of that different address.

**10. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note only through sale of the Property.

**11. RELATIONSHIP TO SECOND NOTE**

**(A) Second Note**

Because Borrower will be required to repay amounts which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to grant a Second Note to the Secretary.

**(B) Relationship of Secretary Payments to this Note**

Payments made by the Secretary shall not be included in the debt due under this Note unless:

    (i)        This Note is assigned to the Secretary; or

    (ii)       The Secretary accepts reimbursements by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments made by the Secretary, including interest on the payments, shall be included in the debt.

**(C) Effect on Borrower**

Where there is no assignment or reimbursement as described in (B)(i) or (ii), and the Secretary makes payments to Borrower, then Borrower shall not:

    (i)        Be required to pay amounts owed under this Note until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note held by the Secretary, notwithstanding anything to the contrary in Paragraph 7 of this Note; or

    (ii)       Be obligated to pay interest or shared appreciation under this Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance of this Note, notwithstanding anything to the contrary in Paragraphs 2 or 5 of this Note or any Allonge to this Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

Dated: _____ 6/24/08 _____

X _Olga E nunez_ _____          _____

Olga Xunez

_____          _____

First Note

3

# ALLONGE TO NOTE

**LOAN NUMBER:** ██████

**FHA CASE NUMBER:** ████████

**BORROWER(S):** OLGA NUNEZ

**PROPERTY ADDRESS:** 9940 SOUTHWEST 155th AVENUE
MIAMI, FL 33196

**NOTE/LOAN AMOUNT** $531,000.00

**NOTE/LOAN DATE:** 6/24/2008

**Pay to the order of**
**without Recourse**

**World Alliance Financial Corp.**

By: Kenneth L. Peskin
Chief Operating Officer

EXHIBIT C

## HOME EQUITY CONVERSION LOAN AGREEMENT

**FHA Case Number:** ███████

This agreement is made on **June 24, 2008** among **Olga Nunez** ("Borrower") and **World Alliance Financial Corp.** ("Lender") and the Secretary of Housing and Urban Development ("Secretary").

### Article 1- Definitions

**1.1.** **"Expected Average Mortgage Interest Rate"** means the amount indicated on the attached payment plan (Exhibit 1). It is a constant interest rate used to calculate monthly payments to the Borrower throughout the life of the loan.

**1.2.** **"Loan Advances"** means all funds advanced from or charged to Borrower's account under conditions set forth in this Loan Agreement, whether or not actually paid to Borrower.

**1.3.** **"Loan Documents"** means the Note, Second Note, Security Instrument and Second Security Instrument.

**1.4.** **"Maximum Claim Amount"** means the lesser of the appraised value of the Property or the maximum dollar amount for an area established by the Secretary for a one-family residence under Section 203(b)(2) of the National Housing Act (as adjusted where applicable under Section 214 of the National Housing Act). Both the appraised value and the maximum dollar amount for the area shall be as of the date the conditional commitment is issued. Closing costs shall not be taken into account in determining appraised value.

**1.5.** **"Note"** means the promissory note signed by Borrower together with this Loan Agreement and given to Lender to evidence Borrower's promise to repay, with interest, Loan Advances by Lender or Lender's assignees.

**1.6.** **"Principal"** or **"Principal Balance"** means the sum of all Loan Advances made as of a particular date, including interest and mortgage insurance premiums.

**1.7.** **"Principal Limit"** means the amount indicated on the attached payment plan (Exhibit 1) when this Loan Agreement is executed, and increases each month for the life of the loan at a rate equal to one-twelfth of the Mortgage Interest Rate in effect at that time, plus one-twelfth of one-half percent per annum. The Principal Limit is calculated using factors provided by the Secretary, which take into account the age of the youngest Borrower, the Mortgage Interest Rate, and the Maximum Claim Amount.

**1.8.** **"Principal Residence"** means the dwelling where the Borrower maintains his or her permanent place of abode, and typically spends the majority of the calendar year. A person may have only one principal residence at any one time. The Property shall be considered to be the Principal Residence of any Borrower who is temporarily or permanently in a health care institution as long as the Property is the Principal Residence of at least one other Borrower who is not in a health care institution.

**1.9.** **"Property"** means Borrower's property identified in the Security Instrument.

**1.10.** **"Second Note"** means the promissory note signed by Borrower together with this Loan Agreement and given to the Secretary to evidence Borrower's promise to repay, with interest, Loan Advances by the Secretary secured by the Second Security Instrument.

**1.11.** **"Second Security Instrument"** means the mortgage, deed of trust, security deed or other security instrument which is signed by Borrower together with this Loan Agreement and which secures the Second Note.

**1.12.** **"Security Instrument"** means the mortgage, deed of trust, security deed or other security instrument which is signed by Borrower together with this Loan Agreement and which secures the Note.

### Article 2 - Loan Advances

**2.1.** <u>**General.**</u> Lender agrees to make Loan Advances under the conditions set forth in this Loan Agreement in consideration of the Note and Security Instrument given by Borrower on the same date as this Loan Agreement.

**2.2.** <u>**Initial Advances.**</u>

**2.2.1.** Loan Advances shall be used by Lender to pay, or reimburse Borrower for, closing costs listed in the Schedule of Closing Costs (Exhibit 2) attached to and made a part of this Loan Agreement, provided that Loan Advances will only be used to pay origination fees in an amount not exceeding the greater of $2,000 or 2 percent of the maximum claim amount, nor shall the Lender charge the Borrower an origination fee in excess of this amount.

**2.2.2.** Loan Advances shall be used by Lender to discharge the liens on the Property listed in the Schedule of Liens (Exhibit 2) attached to and made a part of this Loan Agreement.

Loan Agreement

**2.2.3.**  Lender shall pay an initial Loan Advance to Borrower in the amount indicated on the attached payment plan (Exhibit 1).

**2.2.4.**  Initial advances required by this Section 2.2. shall be made as soon as such advances are permitted by the applicable provisions of 12 CFR Part 226 (Truth in Lending) governing Borrower's right of rescission, but not before that time.

### 2.3.    Set Asides.

**2.3.1.**  Amounts set aside from the Principal Limit shall be considered Loan Advances to the extent actually disbursed or earned by Lender.

**2.3.2.**  Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) for repairs to be made in accordance with a Repair Rider attached to and made a part of this Loan Agreement (Exhibit 3).

**2.3.3.**  Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) to be applied to payments due for first year property charges consisting of taxes, hazard insurance, ground rents and assessments.

**2.3.4.**  Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) to be applied to payment due for a fixed monthly charge for servicing activities of Lender or its servicer. Such servicing activities are necessary to protect Lender's interest in the Property. A servicing fee set aside, if any, is not available to the Borrower for any purpose, except to pay for loan servicing.

**2.4.    Charges and Fees.**  Borrower shall pay to Lender reasonable and customary charges and fees as permitted under 24 CFR 206.207(a). Such amounts shall be considered Loan Advances when actually disbursed by Lender.

### 2.5.    Monthly Payments.

**2.5.1.**  Loan Advances paid directly to the Borrower shall be made in equal monthly payments if requested by Borrower.

**2.5.2.**  Monthly payments shall be calculated for either the term payment plan or the tenure payment plan, as requested by Borrower.

**2.5.3.**  Monthly payments under the term payment plan are made only during a term chosen by the Borrower and shall be calculated so that the sum of (i) or (ii) added to (iii), (iv), (v) and (vi) shall be equal to or less than the Principal Limit at the end of the term:

(i)      Initial Advances under Section 2.2., plus any initial servicing fee set aside under Subsection 2.3.4., or

(ii)     The Principal Balance at the time of a change in payments under Sections 2.8. and 2.9. plus any remaining servicing fee set aside under Subsection 2.3.4., and

(iii)    The portion of the Principal Limit set aside as a line of credit under Section 2.7., including any set asides for repairs (Subsection 2.3.2.) and first year property charges (Subsection 2.3.3.), and

(iv)    All monthly payments due through the payment term, including funds withheld for payment of property charges under Section 2.10., and

(v)     All mortgage insurance premiums, or monthly charges due to the Secretary in lieu of mortgage insurance premiums, which are due through the payment term (Subsection 2.13.), and

(vi)    All interest through the payment term. The Expected Average Mortgage Interest Rate shall be used for this purpose.

**2.5.4.**  Monthly payments under the tenure payment plan shall be calculated as in Subsection 2.5.3. as if there were a payment term with the number of months in the term equal to the sum of 100 minus the age of the youngest Borrower multiplied by 12, but payments shall continue until the loan becomes due and payable as provided in the Loan Documents.

**2.5.5.**  Monthly payments shall be paid to Borrower on the first business day of a month.

**2.5.6.**  If Borrower has requested monthly payments, payments shall be indicated on the attached payment plan (Exhibit 1). The payment plan may be changed by Borrower as provided in Sections 2.8. and 2.9.

### 2.6.    Line of Credit Without Monthly Payments.

**2.6.1.**   Borrower can request Loan Advances under a line of credit payment plan in amounts and at times determined by the Borrower, if the Principal Balance of the loan after the Loan Advance is made is less than or equal to the applicable Principal Limit, excluding any portion of the Principal Limit set aside under Sections 2.3.2. or 2.3.4.   The line of credit amount increases at the same rate as the total Principal Limit increases under Section 1.7.

**2.6.2.**   Line of credit payments shall be paid to Borrower within five (5) business days after the Lender has received a written request for payment by Borrower.

**2.6.3.**   Lender may specify a form for line of credit payment requests.

**2.6.4.**   Lender shall provide Borrower with a statement of the account every time a line of credit payment is made.  The statement shall include the current interest rate, the previous Principal Balance, the amount of the current Loan Advance, the current Principal Balance after the Loan Advance, and the current Principal Limit.

**2.7.**   <u>Line of Credit with Monthly Payments.</u>

**2.7.1.**   A Borrower may receive monthly payments under either a term or tenure payment plan combined with a line of credit, as indicated on the attached payment plan (Exhibit 1).

**2.7.2.**   Subsections 2.6.2, 2.6.3 and 2.6.4 apply to a line of credit combined with term or tenure payments.

**2.7.3.**   If Borrower combines a line of credit with a term or tenure payment plan, the Principal Limit is divided into:  (a) an amount for the line of credit payments, including repair and property charge set asides, (b) an amount for monthly payments which shall be calculated under Subsection 2.5.3. or 2.5.4. and (c) an amount for a servicing fee set aside, if required by Lender under Subsection 2.3.4.  Amounts designated for line of credit payments and monthly payments increase independently at the same rate as the total Principal Limit increases under Section 1.7.  Borrower can request Loan Advances in amounts and at times determined by Borrower, if the requested amount is less than or equal to the difference between (a) the Principal Limit applicable to the line of credit set aside and (b) the portion of the outstanding Principal Balance attributable to draws on the line of credit, including accrued interest and mortgage insurance premium or monthly charge due to the Secretary, but excluding any portion of the Principal Limit set aside under Subsections 2.3.2. and 2.3.4.

**2.7.4.**   A Borrower receiving monthly payments in combination with a line of credit may prepay the outstanding mortgage balance in accordance with the terms of the Note.

**2.8.**   <u>Change in Payments Generally.</u>

**2.8.1.**   Whenever the Principal Balance of the loan is less than the Principal Limit, Borrower may change from any payment plan allowable under this Loan Agreement to another.

**2.8.2.**   If Borrower requests that monthly payments be made after a change in payment plan, Lender shall recalculate future monthly payments in accordance with Subsections 2.5.3. or 2.5.4.

**2.8.3.**   Lender may charge a fee not to exceed the amount determined by the Secretary, whenever payments are recalculated and in any other circumstances in which Borrower is required to sign a form acknowledging a change in payment plan as provided in Subsection 2.8.5.

**2.8.4.**   Loan Advances under a new payment plan shall be paid to Borrower in the same manner and within the time period required under Sections 2.5., 2.6. or 2.7.

**2.8.5.**   Changes in the payment plan must be acknowledged by Borrower by signing a form containing the same information as the attached payment plan (Exhibit 1).  Lender shall provide a copy of the completed form to Borrower.

**2.9.**   <u>Change in Payments Due to Initial Repairs.</u>

**2.9.1.**   If initial repairs after closing, made in accordance with the Repair Rider, are completed without using all of the repair set aside, Lender shall inform Borrower of the completion and the amount then available to the Borrower to be drawn under a line of credit.

**2.9.2.**   If initial repairs after closing, made in accordance with the Repair Rider, cannot be fully funded from the repair set aside, any additional Loan Advances needed to complete repairs shall be made in the manner provided under Section 2.16.

**2.9.3.**   If initial repairs are not completed when required by the Repair Rider, Borrower shall not request and Lender shall not make any further payments, except as needed to pay for repairs required by the Repair Rider and mandatory Loan Advances under Section 4.5.  In order to complete the required repairs, Loan Advances shall be made first from the repair set aside, and then in the manner provided under Section 2.16.

Loan Agreement

**2.10.**    **Payment of Property Charges.**

**2.10.1.** Borrower has elected to require Lender to use Loan Advances to pay property charges consisting of taxes, hazard insurance premiums, ground rents and special assessments if indicated on the attached payment plan (Exhibit 1). Borrower may change this election by notifying Lender and at that time Lender shall pay to Borrower any amounts withheld from the Loan Advances to pay property charges.

**2.10.2.** If Borrower has made the election under Subsection 2.10.1. and Borrower is receiving monthly payments, Lender shall withhold amounts from each monthly payment and use the amounts withheld to make timely payments of property charges. The amounts withheld shall be calculated as provided in Subsection 2.10.3. Amounts withheld from monthly payments shall not be treated as Loan Advances and shall not bear interest except to the extent actually disbursed by Lender.

**2.10.3.** Lender shall withhold from each monthly payment an amount to pay (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for fire, flood and other hazard insurance required by the Security Instrument. Each monthly withholding for items (a), (b) and (c) shall equal one-twelfth of the annual amounts, as reasonably estimated by Lender. The full annual amount for each item shall be paid by Lender before an item would become delinquent. Lender shall add the amounts for items (a), (b) and (c) to the Principal Balance when paid. If at any time the withholding for item (a), (b), or (c) exceeds the amount of actual property charges, Lender shall pay the excess withholding to Borrower and add it to the Principal Balance. If the total of the withholding for item (a), (b), or (c) is insufficient to pay the item when due, the amount necessary to make up the deficiency on or before the date the item becomes due shall be paid as a Loan Advance in the manner provided under Section 2.16.

**2.10.4.** If Borrower has made the election under Subsection 2.10.1. and Borrower is not receiving monthly payments, Lender shall make Loan Advances under the line of credit payment plan as needed to make timely payments of property charges, provided that no such Loan Advance shall exceed the amount permitted by Section 2.6.1.

**2.10.5.** If Borrower fails to pay the property charges in a timely manner, and has not elected to have Lender make the payments, Lender shall pay the property charges as a Loan Advance as required under Section 2.16. If a pattern of missed payments occurs, Lender may establish procedures to pay the property charges from Borrower's funds as if Borrower elected to have Lender pay the property charges.

**2.10.6.** Lender shall immediately notify any Borrower who has made the election under Subsection 2.10.1 whenever Lender determines that amounts available from monthly payments or line of credit payments will be insufficient to pay property charges.

**2.11.**    **Insurance and Condemnation Proceeds.** If insurance or condemnation proceeds are paid to Lender, the Principal Balance shall be reduced by the amount of the proceeds not applied to restoration or repair of the damaged Property and the available loan funds shall be recalculated. At the same time, the Principal Limit also shall be reduced by the amount of the proceeds applied to reduce the Principal Balance.

**2.12.**    **Interest.**

**2.12.1.** Interest shall be calculated as provided in the Loan Documents.

**2.12.2.** Interest shall accrue daily and be added to the Principal Balance as a Loan Advance at the end of each month.

**2.13.** **Mortgage Insurance Premium (MIP); Monthly Charge.**

**2.13.1.** Monthly MIP shall be calculated as provided in 24 CFR Part 206. If the Security Instrument is held by the Secretary or if the Secretary makes Loan Advances secured by the Second Security Instrument, a monthly charge shall be due to the Secretary and shall be calculated in the same manner as MIP.

**2.13.2.** The full amount of monthly MIP or monthly charge, including any portion of the MIP retained by a Lender under 24 CFR 206.109, shall be considered to be a Loan Advance to Borrower on the later of the first day of the month or the day Lender pays the MIP to the Secretary, if any MIP is due to the Secretary. In the event that the Note becomes due and payable or the Note is prepaid in full after the first day of the month, Lender may add the accrued MIP to the Principal Balance or the Secretary may add the accrued monthly charge to the Principal Balance.

**2.14.**    **Manner of Payment.** For purposes of this Section "Borrower" shall not include any person who signed this Loan Agreement but who has a Principal Residence different from the Property. Only a Borrower has a right to receive Loan Advances. Borrowers shall choose to receive Loan Advances by either electronic funds transfer to a bank account designated by all Borrowers or by check mailed to an address designated by all Borrowers, except where all Borrowers agree that payment should be made directly to a third party for the benefit of the Borrowers. Borrowers may change the manner of payment by notifying Lender.

Loan Agreement

**2.15.**    **Protection of Property.**

**2.15.1.** If Borrower vacates or abandons the Property, or if Borrower is in default under the Security Instrument, then Lender may make reasonable expenditures to protect and preserve the Property and these expenditures will be considered Loan Advances as required under Section 2.16.

**2.15.2.** If Borrower fails to pay governmental or municipal charges, fines or impositions that are not included in Section 2.10. or if there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property. These expenditures will be considered Loan Advances as required under Section 2.16.

**2.16.**    **Unscheduled Payments.**  Loan Advances made pursuant to Sections 2.4., 2.9.2., 2.9.3., 2.10.3., 2.10.5. and 2.15. shall be made from a line of credit under Section 2.6. or 2.7. to the extent possible.  If no line of credit sufficient to make the Loan Advances exists, any future monthly payments must be recalculated in accordance with Subsection 2.5.3. or 2.5.4. to create a line of credit sufficient to make the Loan Advances.

### Article 3 - Late Charge

**3.1.**    **Amount Due.**  Lender shall pay a late charge to the Borrower for any late payment.  If Lender does not mail or electronically transfer a scheduled monthly payment to Borrower on the first business day of the month or mail or electronically transfer a line of credit payment to Borrower within five (5) business days of the date Lender received the request, the late charge shall be ten percent (10%) of the entire amount that should have been paid to the Borrower for that month or as a result of that request.  For each additional day that Lender fails to make payment, Lender shall pay interest on the late payment at the interest rate stated in the Loan Documents.  If the Loan Documents provide for an adjustable interest rate, the rate in effect when the late charge first accrues shall be used.  In no event shall the total late charge and interest exceed five hundred dollars ($500.00).  Any late charge shall be paid from Lender's funds and shall not be added to the unpaid Principal Balance.

**3.2.**    **Waiver.**  The Secretary may waive a late charge where the Secretary determines that the late payment resulted from circumstances beyond Lender's control and that no act or omission of Lender contributed to the late payment.  At the time Lender requests a waiver, Lender shall inform Borrower that a waiver of late charge has been requested from the Secretary and that the late charge will be sent to Borrower if the waiver is denied.  If the Secretary denies the waiver, Lender shall pay to Borrower the late charge and interest that accrued from the date the payment was late until the date the waiver was requested.

### Article 4 - Termination of Lender's Obligation to Make Loan Advances

**4.1.**    **Loan Due and Payable.**  Lender shall have no obligation to make Loan Advances if Lender has notified Borrower that immediate payment in full to Lender is required under one or more of the Loan Documents unless and until the notice is rescinded by Lender.

**4.2.**    **Loan Advances by Secretary.**  If the Security Instrument has been assigned to the Secretary or the Secretary notifies Lender and Borrower that Loan Advances are secured by the Second Security Instrument, Lender shall have no further obligation to make Loan Advances under this Loan Agreement, unless the Secretary accepts later reimbursement by the Lender for all Loan Advances made, earned or disbursed by the Secretary.  The Secretary may establish procedures for handling requests for payments and changes in payment plans during the interval between Lender's notification of intent to assign the Security Instrument to the Secretary and completion of the assignment. Borrower shall be informed of such procedures by Lender and/or the Secretary, and Borrower shall comply with such procedures.

**4.3.**    **Lien Status Jeopardized.**  Lender shall have no obligation to make further Loan Advances if the Lender or the Secretary determines that the lien status of the Security Instrument or the Second Security Instrument is jeopardized under State laws as described in Paragraph 12(a) of the Security Instrument or Second Security Instrument and the lien status is not extended in accordance with Paragraph 12(a).

**4.4.**    **Bankruptcy.**  Lender shall have no obligation to make further Loan Advances on or following the date that a petition for bankruptcy of Borrower is filed.

**4.5.**    **Mandatory Loan Advances.**  Notwithstanding anything in Sections 4.1. through 4.4., all Loan Advances under Sections 2.10. (property charges), 2.12. (interest), 2.13. (MIP or monthly charge), 2.15 (protection of Property) or 2.3.4. (servicing fee) shall be considered mandatory Loan Advances by Lender.

**4.6.**    **Prepayment in Full.**  Lender shall not make Loan Advances if Borrower has paid the Note in full (or the Second Note, if the Secretary has assumed the Lender's rights and obligations under Article 5).

## Article 5 - HUD Obligation

If the Lender has no further obligation to make payments to Borrower because of Section 4.2., the Secretary shall assume the rights and obligations of Lender under this Loan Agreement, except the Secretary shall not assume any obligation of paying flood, fire and other hazard insurance from Loan Advances. If the Secretary makes Loan Advances to Borrower under the Second Security Instrument, the portion of the Principal Limit available for Loan Advances shall be the difference between the current Principal Limit and the combined Principal Balances on the Security Instrument less accrued interest and the Second Security Instrument.

## Article 6 - Miscellaneous

**6.1.**     **Forbearance Not a Waiver.**  Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**6.2.**     **Successors and Assigns Bound; Joint and Several Liability; Co-Signers.**  The covenants and agreements of this Loan Agreement shall bind and benefit the successors and assigns of Lender. An assignment made in accordance with the regulations of the Secretary shall fully relieve the Lender of its obligations under this Loan Agreement.  Borrower may not assign any rights or obligations under this Loan Agreement.  Borrower's covenants and agreements shall be joint and several.

**6.3.**     **Notices.**  Any notice to Borrower provided for in this Loan Agreement shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method.  The notice shall be directed to the property address shown in the Security Instrument or any other address all Borrowers jointly designate.  Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower.  Any notice to the Secretary shall be given by first class mail to the HUD Field Office with jurisdiction over the Property or any other place designated by the Secretary.  Any notice provided for in this Loan Agreement shall be deemed to have been given to Borrower, Lender or the Secretary when given as provided in this Section.

**6.4.**     **Governing Law; Severability.**  This Loan Agreement shall be governed by Federal law and the law of the jurisdiction in which the Property is located.  In the event that any provision or clause of this Loan Agreement conflicts with applicable law, such conflict shall not affect other provisions of this Loan Agreement which can be given effect without the conflicting provision.  To this end the provisions of this Loan Agreement are declared to be severable.

**6.5.**     **Copies.**  Lender, Borrower and the Secretary shall each receive one original executed copy of this Loan Agreement when signed by the Secretary.

**6.6.**     **When Agreement Becomes Binding.**  This Loan Agreement shall bind Lender and Borrower when both Lender and Borrower have signed, whether or not the Secretary signs this Loan Agreement.  This Loan Agreement shall bind the Secretary only when and if the Secretary has signed and a Mortgage Insurance Certificate is issued for the Security Instrument.

BY SIGNING BELOW the parties accept and agree to the terms contained in this Loan Agreement and the exhibits.

_Olga E Nunez_
Olga Nunez (Borrower)

World Alliance Financial Corp.

By:
Title:     Kenneth L. Peskin
            C.O.O.

Secretary of Housing and Urban Development

By:_____
Title:

Loan Agreement

-6-

# EXHIBIT 2
## SCHEDULE OF LIENS

Chase Home Finance                                         155,735.46

**Note:  Borrower bringing in funds to cover total payoffs in the amount of $0.00 (if applicable)**

### SCHEDULE OF CLOSING COSTS

| | |
|---|---:|
| Origination Fee | 5,310.00 |
| Broker Fee | 0.00 |
| Mortgage Insurance Premium | 7,080.00 |
| Repair Administration Fee | 0.00 |
| Title Insurance Premium | 1,845.00 |
| Recording Taxes and/or Fees or Stamp Charges | 147.50 |
| | |
| Appraisal Fee | 0.00 |
| Credit Report Fee | 9.95 |
| Escrow Closing Fee | 1,140.00 |
| Document Preparation | 0.00 |
| Notary Fees | 0.00 |
| | |
| Pest Inspection Fee | 0.00 |
| Courier Fee (Lender) | 0.00 |
| Flood Certificate | 19.20 |
| Endorsement Fee | 234.50 |
| | |
| Lenders Inspection Fee | 0.00 |
| Compliance Inspection Fee | 0.00 |
| Hazard Insurance Fee | 3,594.00 |
| Abstract or Title Search | 130.00 |
| Title Examination | 0.00 |
| | |
| Title Insurance Binder | 0.00 |
| Attorney Fee | 0.00 |
| City / County Tax / Stamps | 1,858.50 |
| State Tax / Stamps | 1,062.00 |
| Survey Fee | 0.00 |
| Trust Review Fee | 0.00 |
| Doc Prep | 75.00 |
| Flood Insurance | 373.00 |
| Quoted first year expenses | 0.00 |
| ALTA 8.1-6.2 | |
| Deed Prep Fee | 75.00 |
| Record CMA | 10.00 |
| Record Quit Claim Deed | 19.10 |
| Wire Transfer Fee | |
| Storage Fee | 30.00 |

**Note:  Borrower bringing in funds to cover closing costs in the amount of $0.00 (if applicable)**

*Olga I Nunez*
Olga Nunez  (Borrower)

THIS DOCUMENT HAS A LIGHT BACKGROUND ON TRUE WATERMARKED PAPER. HOLD TO LIGHT TO VERIFY FLORIDA WATERMARK.

## BUREAU of VITAL STATISTICS

**EXHIBIT D**

# CERTIFICATION OF DEATH

**STATE FILE NUMBER:** 2016097046

**DATE ISSUED:** February 10, 2017

## DECEDENT INFORMATION

**STATE FILE DATE:** June 28, 2016

NAME: OLGA E NUÑEZ

DATE OF DEATH: June 23, 2016     SEX: FEMALE     AGE: 096 YEARS
DATE OF BIRTH: February 7, 1920     SSN: 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
BIRTHPLACE: CUBA
PLACE WHERE DEATH OCCURRED:    INPATIENT
FACILITY NAME OR STREET ADDRESS: WEST KENDALL BAPTIST HOSPITAL
LOCATION OF DEATH: MIAMI, MIAMI-DADE COUNTY, 33196

## SURVIVING SPOUSE, DECEDENT'S RESIDENCE AND HISTORY INFORMATION

MARITAL STATUS: WIDOWED
SURVIVING SPOUSE NAME: NONE
RESIDENCE: 9940 SW 155 AVENUE, MIAMI, FLORIDA 33196, UNITED STATES
COUNTY: MIAMI-DADE
OCCUPATION, INDUSTRY: HOMEMAKER, AT HOME
RACE: ___White ___Black or African American ___Asian Indian ___Chinese ___Filipino ___Native Hawaiian
___American Indian or Alaskan Native--Tribe: ___Japanese ___Korean ___Vietnamese
___Guamanian or Chamorro ___Samoan ___Other Pacific Isl:
___Other Asian:   X _Other:MULATTA     ___Unknown
HISPANIC OR HAITIAN ORIGIN? YES, CUBAN
EDUCATION: 8TH GRADE OR LESS     EVER IN U.S. ARMED FORCES? NO

## PARENTS AND INFORMANT INFORMATION

FATHER:     MANUEL PEREZ
MOTHER:     CARMEN CAÑETE
INFORMANT: ALEIDA NUÑEZ
RELATIONSHIP TO DECEDENT:     DAUGHTER
INFORMANT'S ADDRESS: 9940 SW 155 AVENUE, MIAMI, FLORIDA 33196, UNITED STATES

## PLACE OF DISPOSITION AND FUNERAL FACILITY INFORMATION

PLACE OF DISPOSITION: GOLD COAST CREMATORY
                       FORT LAUDERDALE, FLORIDA
METHOD OF DISPOSITION: CREMATION
FUNERAL DIRECTOR/LICENSE NUMBER: LISSETTE SALINAS-ARANA, F021008
FUNERAL FACILITY: CABALLERO RIVERO WESTCHESTER F078957
                   8200 SW 40TH STREET, MIAMI, FLORIDA 33155

## CERTIFIER INFORMATION

TYPE OF CERTIFIER: CERTIFYING PHYSICIAN     MEDICAL EXAMINER CASE NUMBER: NOT APPLICABLE
TIME OF DEATH (24 hr): 1505     DATE CERTIFIED: June 24, 2016
CERTIFIER'S NAME: JESUS JULIO CID
CERTIFIER'S LICENSE NUMBER: ME85922
NAME OF ATTENDING PHYSICIAN (If other than Certifier): NOT ENTERED

*Ken Jones*

, State Registrar

REQ: 2017826542

THE ABOVE SIGNATURE CERTIFIES THAT THIS IS A TRUE AND CORRECT COPY OF THE OFFICIAL RECORD ON FILE IN THIS OFFICE
**WARNING:** THIS DOCUMENT IS PRINTED OR PHOTOCOPIED ON SECURITY PAPER WITH WATERMARKS OF THE GREAT SEAL OF THE STATE OF FLORIDA. DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATER-MARKS. THE DOCUMENT FACE CONTAINS A MULTICOLORED BACKGROUND, GOLD EMBOSSED SEAL. AND THERMOCHROMIC FL. THE BACK CONTAINS SPECIAL LINES WITH TEXT. THE DOCUMENT WILL NOT PRODUCE A COLOR COPY

DH FORM 1946 (03-13)



CERTIFICATION OF VITAL RECORD



*3 5 8 1 6 3 2 8*

VOID IF ALTERED OR ERASED

Composite Exhibit E

# Residential Loan Application for Reverse Mortgages

This application is designed to be completed by the applicant(s) with the lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must be provided when a person other than the "Borrower" (including the Borrower's spouse) is a co-owner of the real property that will be used as a basis for loan qualification or the Borrower's spouse is not a co-owner of the real property that will be used as a basis for loan qualification, but the Borrower resides in a community property state or the security property is located in a community property state.

## I. Type of Mortgage and Terms of Loan

| Mortgage Applied for: | FHA Case No. (HECM) ▮▮▮▮ | Lender Case No. ▮▮▮▮ |
|---|---|---|
| ___ Home Keeper (Fannie Mae) | | |
| ✓ HECM (FHA)* | Loan Payment Plans: | ___ Term (HECM only) |
| ___ Other _____ | ___ Line of Credit (not available in Texas) | ___ Modified Tenure |
| (specify) | ___ Modified Term (HECM only) | ___ Other |
| *Complete HUD/VA Addendum | ✓ Tenure | |

| Special Loan Features: ___ Equity Share    Other (specify): _____ |
|---|
| Amortization Type: ✓ ARM (type):    Monthly _____ (indicate monthly or annual) |
| ___ Fixed Rate    Other (explain): _____ |

## II. Property Information

Subject Property Address (street, city, state, county, and zip code):

9940 Southwest 155th Avenue, Miami, FL 33196 in Miami-Dade County

Legal Description of Subject Property (attach description if necessary):

Legal description attached hereto as Exhibit A and by this reference made a part hereof.

Property Title is Held in These Names: (Please list all names on property title):

Olga Nunez

| No. of Units: 1 | Year Built: 1993 | Estimate of Appraised Value: $354,000 |
|---|---|---|
| Residence Type: ✓ Primary Residence | ___ Secondary Residence | ___ Investment Property |
| Property Title Held As: ✓ Fee Simple | ___ Life Estate | ___ Leasehold (Expiration Date: _____) |
| Check if title is also held as: _____ Inter Vivos (Living) Trust | | |

## III. Borrower Information

| Borrower's Name (Include Jr. or Sr., if applicable) | Co-Borrower's Name (Include Jr. or Sr., if applicable) |
|---|---|
| Olga Nunez | |

| Social Security Number 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 | DOB (MM/DD/YYYY) 02/07/1920 | Social Security Number | DOB (MM/DD/YYYY) |
|---|---|---|---|

| Monthly Income: $    656.00 | Monthly Income: $ |
|---|---|
| Real Estate Assets: $    354,000.00 | Real Estate Assets: $ |
| Available Assets: $ | Available Assets: $ |
| Home Phone (including area code): (305) 388-1436 | Home Phone (including area code): |
| Years of Residence at Present Address: 3 | Years of Residence at Present Address: |
| Mailing Address, if different from Subject Property Address | Mailing Address, if different from Subject Property Address |

| Marital Status: ___ Married    ✓ Unmarried (include Single, divorced, widowed) | Marital Status: ___ Married    ___ Unmarried (include single, divorced, widowed) |
|---|---|
| Alternative Contact Person (name, address, phone): RICARDO JIMENEZ 9940 SW 155 AVE, MIAMI, FL 33196 786-406-8369 | Alternative Contact Person (name, address, phone): |

Fannie Mae Form 1009  05/2004

Case 17-21018-LMI    Doc 48    Filed 01/29/18    Page 40 of 62

**IV. Liens Against The Property**

List the creditor's name, address, and account number for all liens against the property.
NOTE: This section should not be used to list all personal liabilities, only liens against the property.

| Name of Creditor | Address of Creditor | Unpaid Balance |
|---|---|---|
| Chase Home Finance<br><br>Account Number | | $ 155,735.46 |
| Name of Creditor<br><br>Account Number | Address of Creditor | Unpaid Balance<br><br>$ |
| Name of Creditor<br><br>Account Number | Address of Creditor | Unpaid Balance<br><br>$ |
| | Total liens to be paid: | $ 155,735.46 |

**V. Total Non-Real Estate Debts**

Total Amount of Non-Real Estate Debts: $

**VI. Declarations**

If you answer "Yes" to any questions a through h,
Please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | ☐ | ☑ | ☐ | ☐ |
| b. Have you filed for any bankruptcy that has not been resolved? | ☐ | ☑ | ☐ | ☐ |
| c. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☐ |
| d. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? [If "Yes," give details, including date, name and address of lender, FHA or VA Case number (if applicable), and reason for delinquency/default.] | ☐ | ☑ | ☐ | ☐ |
| e. Do you intend to occupy the property as your primary residence? | ☑ | ☐ | ☐ | ☐ |
| f. Are you a co-maker or endorser on a note? (Optional for HUD) | ☐ | ☑ | ☐ | ☐ |
| g. Are you a U.S. citizen? (Optional for HUD) | ☑ | ☐ | ☐ | ☐ |
| h. Are you a permanent resident alien? (Optional for HUD) | ☐ | ☑ | ☐ | ☐ |

Will proceeds from this loan be used for Home Improvements? ☐ Yes ☑ No    If Yes, how much? $

Fannie Mae Form 1009   05/2004

Page 2 of 4

---

**VII. Acknowledgment and Agreement**

Each of the undersigned specifically represents to Lender and Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust of the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; and (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property.

Certification: I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United State Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| x _Olga F Nunes_ | 6/24/08 | x | |

**VIII. Information for Government Monitoring Purposes**

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the Lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information. | | CO-BORROWER | ☐ I do not wish to furnish this information. | |
|---|---|---|---|---|---|
| Ethnicity: | ✓ Hispanic or Latino | ☐ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native | ☐ Asian ☐ Black or African American | Race: | ☐ American Indian or Alaska Native | ☐ Asian ☐ Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander | ☐ White | | ☐ Native Hawaiian or Other Pacific Islander | ☐ White |
| Sex: | ✓ Female | ☐ Male | Sex: | ☐ Female | ☐ Male |

| TO BE COMPLETED BY INTERVIEWER This application was taken by: | Interviewer's Name (print or type) Othoniel Gomez | | Name and Address of Interviewer's Employer |
|---|---|---|---|
| ✓ Face-to-face interview | Interviewer's Signature | Date | First Financial Home Mortgage Corp. 6175 NW 153 St. # 230 Miami Lakes, FL 33014 |
| ☐ Mail | Interviewer's Phone Number (include area code) | | |
| ☐ Telephone | (305) 817-9300 | | |

NOTE: FHA insures reverse mortgages for one to four family units under various provisions of the National Housing Act. The information contained on the loan application will be improved by collecting this data as determinations can be made regarding the characteristics of those borrowers obtaining HECM loans. The performance function of the agency will be improved by collecting this data as determinations can be made regarding the characteristics of those borrowers obtaining HECM loans. The Public Reporting Burden for this collection is estimated to average one hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data and completing and reviewing the collection of information. A response is required to obtain a HECM loan, but parties are not required to use this particular form. This information is covered by the Privacy Act.

**Fannie Mae Form 1009**   05/2004

## Instructions for completing the residential loan application for reverse mortgages
### (Fannie Mae 1009) and Addendum

**1. Instructions for completing the residential loan application for reverse mortgages**

For the borrower's application for a Fannie Mae conventional reverse mortgage (Home Keeper Mortgage) or an FHA-insured reverse mortgage (Home Equity Conversion Mortgage, or HECM), the lender has the option of using the Residential Loan Application for Reverse Mortgage (Fannie Mae Form 1009) or the Uniform Residential Loan Application (Freddie Mac Form 65/Fannie Mae Form 1003).

For both forms, if the mortgage applied for is a HECM, the HUD/VA Addendum (HUD 92900-A) must be completed.

The Residential Loan Application for Reverse Mortgage, Fannie Mae Form 1009, must be completed as detailed below for the Home Keeper Mortgage or the HECM:

**Section I. Type Of Mortgage And Terms Of Loan**

Mortgage Applied for - Check the type of reverse mortgage for which application is being made: Home Keeper, HECM, or Other type of reverse mortgage. If Other is selected, the mortgage product must be specified. If HECM is selected, the HUD/VA Addendum must be completed and attached to the application.

FHA Case No. - If the mortgage applied for is a Home Keeper, this section should be left blank. If the mortgage applied for is a HECM, the FHA case number should be entered followed by the appropriate Section of the Act ADP Code for HECMs listed below:

| | HUD-Processed | Direct Endorsement |
|---|---|---|
| Assignment/Fixed-rate | 911 | 951 |
| Assignment/Adjustable-rate | 912 | 952 |
| Shared Premium/Fixed-rate | 913 | 953 |
| Shared Premium/ARM | 914 | 954 |
| Shared Appreciation/Fixed-rate | 915 | 955 |
| Shared Appreciation/ARM | 916 | 956 |
| Condo (Fixed) | 917 | 957 |
| Condo (ARM) | 918 | 958 |

Lender Case No. - Indicate the case number assigned by the lender. This case number can be any combination of letters and numbers, as determined by the lender.

Loan Payment Plans - Indicate the payment plan in which the applicant is interested. The applicant can change the payment plan selection at closing.

Special Loan Features - The Equity Share Option is only available under the Home Keeper Mortgage. Other special loan features pertaining to specific reverse mortgage products must be detailed in the space provided.

Amortization Type - Indicate either fixed-rate or adjustable-rate (ARM) amortization. If ARM is selected, indicate if the adjustment will occur monthly or annually.

**Section II. Property Information**

Subject Property Address - The address of the applicant's primary residence—including the county name and the zip code-should be entered.

Legal Description of Subject Property - Enter the legal description of the property as shown on the title insurance commitment or survey. The legal description may be attached to the loan application if it is lengthy.

No. of Units - Enter the number of family units on the subject property. For example, "1" would be used to indicate a single-family property. "2" would indicate a duplex, etc.

Year Built - Indicate the year the property was constructed.

Estimate of Appraised Value - Enter an estimate of the property value. (An exact valuation is not necessary as verification will occur during the property appraisal process.)

Residence Type - Primary residence must be checked. Check "primary residence" and "investment property" if applicant resides in a multi-unit property with rental tenants.

Property Title is Held in These Names - List names of all titleholders to the property.

Property Title Held As - Identify how the property rights are held: fee simple, life estate, or leasehold estate. If leasehold estate is selected, enter the expiration date of the lease. If title is also held as an inter vivos (living) trust, check the corresponding box.

**Section III. Borrower Information**

Borrower's Name - Indicate the full legal name of the applicant, as the titleholder to the subject property.

Co-Borrower's Name - Indicate the full legal name of the co-applicant, if also a titleholder to the subject property.

Social Security Number - Enter the applicant's social security number, and co applicant's social security number, if applicable.

Date of Birth - Enter the applicant's birth date, and co-applicant's birth date if, applicable

Monthly Income - Enter the applicant's monthly income, and co-applicant's monthly income, if applicable.

Real Estate Assets - Enter total value of applicant's real estate assets.

Available Assets - Enter the amount of the applicant's available (liquid) assets.

Home Phone - Enter the applicant's home phone number, and co-applicant's home phone number, if applicable. Include the area code for each phone number.

Years of Residence at Present Address - Enter the number of years the applicant has resided at the subject property address. Provide the same information for the co-applicant, if applicable.

Marital Status - Check box that represents the applicant's marital status. If separated but not divorce, the "Married" box should be selected. Provide the same information for the co-applicant, if applicable.

Alternative Contact Person - If the application is for a Home Keeper Mortgage, provide the name, home address, and telephone number for a family member, friend, or advisor to the applicant. The contact person should be someone who has access to and/or maintains regular communication with the applicant. Provide the same information for the co-applicant, if applicable. (This information is optional for the HECM loan.)

**Section IV. Liens Against The Property**

The applicant must provide information on unpaid liens against the property. The name and address of the creditor(s), as well as the lien account number(s) and balance(s) owed, must be completed. The total unpaid balance of these property liens should be totaled and entered in the space provided.

**Section V. Non-real Estate Debts**

List the total of all debts not related to real estate.

**Section VI. Declarations**

The applicant and co-applicant, if applicable, must complete blocks a. through f., using "Yes" or "No" as responses. Block d. requires a detailed explanation if the response is affirmative. Blocks f., g., and h. are not required for HECM application.

**Section VII. Acknowledgment and Agreement**

The applicant and co-applicant, if applicable, should read this section carefully, indicate the date of signature, and sign in the pertinent blocks.

**Section VIII. Information For Government Monitoring Purposes**

These blocks may be completed. If the borrower chooses not to furnish any or all of this information, Federal Regulations require that the lender note that choice on the application. Federal Regulations also require the lender to note the race or national origin and sex of the applicant on the basis of visual observation or surname. This information is collected, in part, for the Home Mortgage Disclosure Act (HMDA).

**2. Instructions for completing the HUD/VA Addendum (Form (92900-A)**

The HUD/VA Addendum (92900-A) consists of five (5) pages, the first four of which must be completed. These four pages contain statutory and regulatory information and certifications and should be completed, signed, and dated, and included in the case binder. For lenders who are not approved for direct endorsement or have preclosing status, the documentation should be completed, signed and included in the case binder at the time of submission for firm commitment. Page five may be omitted since it is the Veteran's Administration Commitment for Guaranty and is not applicable. A copy of the Addendum must be provided to the borrower. The instructions listed below relate to completing the Addendum for the HECM Program.

**PART I - Identifying Information**

Section of the Act(Block 4) - Enter the same code that follows the FHA case number in Section 1 of the loan application.

Loan Amount (Block 7) - The principal limit should be entered in this block Interest Rate (Block 8) - The Expected Average Mortgage Interest Rate ("expected rate") should be entered in the block.

Blocks 9, 10, 12a., 12b., and 20 should not be completed.

Fannie Mae Form 1009   05/2004

# HUD/VA Addendum to Uniform Residential Loan Application

Doc Time

OMB Approval No. ▓▓▓▓▓▓
HUD: ▓▓▓▓▓(exp. 9/30/2007)

| Part I - Identifying Information (mark the type of application) | | 2. Agency Case No. (include any suffix) | 3. Lender's Case No. | 4. Section of the Act (for HUD cases) |
|---|---|---|---|---|
| 1. ☐ VA Application for Home Loan Guaranty | ☒ HUD/FHA Application for Insurance under the National Housing Act | ▓▓▓▓▓ | | 255 |

| 5. Borrower's Name & Present Address (include zip code) | 7. Loan Amount (include the UFMIP if for HUD or Funding Fee if for VA) $ 354,000.00 | 8. Interest Rate 4.320 % | 9. Proposed Maturity yrs. mos. |
|---|---|---|---|
| Olga Nunez 9940 Southwest 155th Avenue, Miami, FL 33196 | 10. Discount Amount (only if borrower is permitted to pay) $ | 11.Amount of Up Front Premium | 12a. Amount of Monthly Premium $ 122 / mo. | 12b. Term of Monthly Premium months |

| 6. Property Address (including name of subdivision, lot & block no. & zip code) | 13. Lender's I.D. Code | 14.Sponsor / Agent I.D. Code |
|---|---|---|
| 9940 Southwest 155th Avenue, Miami, FL 33196 | | |

| 15. Lender's Name & Address (include zip code) | 16. Name & Address of Sponsor / Agent |
|---|---|
| First Financial Home Mortgage Corp. 6175 NW 153 St. # 230 Miami Lakes, FL 33014 **Type or Print all entries clearly** | World Alliance Financial Corp. 3 Huntington Quadrangle, 303N Melville, NY 11747 |
| | 17. Lender's Telephone Number (305) 817-9300 |

**VA:** The veteran and the lender hereby apply to the Secretary of Veterans Affairs for Guaranty of the loan described here under Section 3710, Chapter 37, Title 38, United States Code, to the full extent permitted by the veteran's entitlement and severally agree that the Regulations promulgated pursuant to Chapter 37, and in effect on the date of the loan shall govern the rights, duties, and liabilities of the parties.

| 18. First Time Homebuyer? | 19. VA Only Title will be Vested in: | 20. Purpose of Loan (blocks 9 - 12 are for VA loans only) | |
|---|---|---|---|
| a. ☐ Yes | ☐ Veteran | 1) ☐ Purchase Existing Home Previously Occupied | 7) ☐ Construct Home (proceeds to be paid out during construction) |
| b. ☑ No | ☐ Veteran & Spouse | 2) ☐ Finance Improvements to Existing Property | 8) ☐ Finance Co-op Purchase |
| | ☐ Other (specify) | 3) ☑ Refinance (Refi.) | 9) ☐ Purchase Permanently Sited Manufactured Home |
| | | 4) ☐ Purchase New Condo. Unit | 10) ☐ Purchase Permanently Sited Manufactured Home & Lot |
| | | 5) ☐ Purchase Existing Condo.Unit | 11) ☐ Refi. Permanently Sited Manufactured Home to Buy Lot |
| | | 6) ☐ Purchase Existing Home Not Previously Occupied | 12) ☐ Refi. Permanently Sited Manufactured Home/Lot Loan |

## Part II - Lender's Certification

**21.** The undersigned lender makes the following certifications to induce the Department of Veterans Affairs to issue a certificate of commitment to guarantee the subject loan or a Loan Guaranty Certificate under Title 38, U.S. Code, or to induce the Department of Housing and Urban Development - Federal Housing Commissioner to issue a firm commitment for mortgage insurance or a Mortgage Insurance Certificate under the National Housing Act.

**A.** The loan terms furnished in the Uniform Residential Loan Application and this Addendum are true, accurate and complete.

**B.** The information contained in the Uniform Residential Loan Application and this Addendum was obtained directly from the borrower by an employee of the undersigned lender or its duly authorized agent and is true to the best of the lender's knowledge and belief.

**C.** The credit report submitted on the subject borrower (and co-borrower , if any) was ordered by the undersigned lender or its duly authorized agent directly from the credit bureau which prepared the report and was received directly from said credit bureau.

**D.** The verification of employment and verification of deposits were requested and received by the lender or its duly authorized agent without passing through the hands of any third persons and are true to the best of the lender's knowledge and belief.

Items "H" through "J" are to be completed as applicable for VA loans only.

**E.** The Uniform Residential Loan Application and this Addendum were signed by the borrower after all sections were completed.

**F.** This proposed loan to the named borrower meets the income and credit requirements of the governing law in the judgment of the undersigned.

**G.** To the best of my knowledge and belief, I and my firm and its principals: (1) are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency: (2) have not, within a three-year period preceding this proposal, been convicted of or had a civil judgment rendered against them for (a) commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; (b) violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; (3) are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph G(2) of this certification; and (4) have not, within a three-year period preceding this application/proposal, had one or more public transactions (Federal, State or local) terminated for cause or default.

**H.** The names and functions of any duly authorized agents who developed on behalf of the lender any of the information or supporting credit data submitted are as follows:

| Name & Address | Function (e.g., obtained information on the Uniform Residential Loan Application, ordered credit report, verifications of employment, deposits, etc.) |
|---|---|
| | |

**I.** If no agent is shown above, the undersigned lender affirmatively certifies that all information and supporting credit data were obtained directly by the lender. The undersigned lender understands and agrees that it is responsible for the omissions, errors, or acts of agents identified in Item H as to the functions with which they are identified.

**J.** The proposed loan conforms otherwise with the applicable provisions of Title 38, U.S. Code, and of the regulations concerning guaranty or insurance of loans to veterans.

| Signature of Officer of Lender | Title of Officer of Lender | Date (mm/dd/yyyy) 6-24-08 |
|---|---|---|

**Part III - Notices to Borrowers.** Public reporting burden for this collection of information is estimated to average 6 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection information unless that collection displays a valid OMB control number. Privacy Act Information. The information requested on the Uniform Residential Loan Application and this Addendum is authorized by 38 U.S.C. 3710 (if for DVA) and 12 U.S.C. 1701 et seq. (if for HUD/FHA). The Debt Collection Act of 1982, Pub. Law 97-365, and HUD's Housing and Community Development Act of 1987, 42 U.S.C. 3543, require persons applying for a federally insured or guaranteed loan to furnish his/her social security number (SSN). You must provide all the requested information, including your SSN. HUD and/or VA may conduct a computer match to verify the information you provide. HUD and/or VA may disclose certain information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not otherwise be disclosed or released outside of HUD or VA, except as required and permitted by law. The information will be used to determine whether you qualify as a mortgagor. Any disclosure of information outside VA or HUD/FHA will be made only as permitted by law. Failure to provide any of the requested information, including SSN, may

VA Form 26-1802a (3/98)                    page 1                    form HUD-92900-A (06/2005)

result in disapproval of your loan application. This is notice to you as required by the Right to Financial Privacy Act of 1978 that VA or HUD/FHA has a right of access to financial records held by financial institutions in connection with the consideration or administration of assistance to you. Financial records involving your transaction will be available to VA and HUD/FHA without further notice or authorization but will not be disclosed or released by this institution to another Government Agency or Department without your consent except as required or permitted by law.
**Caution.** Delinquencies, defaults, foreclosures and abuses of mortgage loans involving programs of the Federal Government can be costly and detrimental to your credit, now and in the future. The lender in this transaction, its agents and assigns as well as the Federal Government, its agencies, agents and assigns, are authorized to take any and all of the following actions in the event loan payments become delinquent on the mortgage loan described in the attached application: (1) Report your name and account information to a credit bureau; (2) Assess additional interest and penalty charges for the period of time that payment is not made; (3) Assess charges to cover additional administrative costs incurred by the Government to service your account; (4) Offset amounts owed to you under other Federal programs; (5) Refer your account to a private attorney, collection agency or mortgage servicing agency to collect the amount due, foreclose the mortgage, sell the property and seek judgment against you for any deficiency; (6) Refer your account to the Department of Justice for litigation in the courts; (7) If you are a current or retired Federal employee, take action to offset your salary, or civil service retirement benefits; (8) Refer your debt to the Internal Revenue Service as your taxable income. All of these actions can and will be used to recover any debts owed when it is determined to be in the interest of the lender and/or the Federal Government to do so.

**Part IV - Borrower Consent for Social Security Administration to Verify Social Security Number**

I authorize the Social Security Administration to verify my Social Security number to the Lender identified in this document and HUD/FHA, through a computer match conducted by HUD/FHA.

I understand that my consent allows no additional information from my Social Security records to be provided to the Lender, and HUD/FHA and that verification of my Social Security number does not constitute confirmation of my identity. I also understand that my Social Security number may not be used for any other purpose than the one stated above, including resale or redisclosure to other parties. The only other requirements imposed by this authorization is for review purposes to ensure that HUD/FHA complies with SSA's consent requirements.

I am the individual to whom the Social Security number was issued or that person's legal guardian. I declare and affirm under the penalty of perjury that the information contained herein is true and correct. I know that if I make any representation that I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

This consent is valid for 180 days from the date signed, unless indicated otherwise by the individual(s) named in this loan application.

Signature(s) of Borrower(s) - Read consent carefully.  Review accuracy of social security number(s) and birth dates provided on this application.

X _Olga F Nunez_         X _____         Date signed 6/24/08

**Part V - Borrower Certification**

**22. Complete the following for a HUD/FHA Mortgage .**

22a. Do you own or have you sold other real estate within the past 60 months on which there was a HUD/FHA mortgage?   [ ] Yes [ ] No   Is it to be sold? [ ] Yes [✓] No   22b. Sales Price $ 0.00   22c. Original Mortgage Amt $ 0.00

22d. Address _____

22e. If the dwelling to be covered by this mortgage is to be rented, is it a part of, adjacent or contiguous to any project subdivision or group of concentrated rental properties involving eight or more dwelling units in which you have any financial interest?   [ ] Yes [✓] No   If "Yes" give details.

22f.  Do you own more than four dwellings ?   [ ] Yes [✓] No   If "Yes" submit form HUD-92561.

**23. Complete for VA-Guaranteed Mortgage .**  Have you ever had a VA home Loan?   [ ] Yes [ ] No

**24. Applicable for Both VA & HUD.** As a home loan borrower, you will be legally obligated to make the mortgage payments called for by your mortgage loan contract. The fact that you dispose of your property after the loan has been made **will not relieve you of liability for making these payments. Payment of the loan in full is ordinarily the way liability on a mortgage note is ended.** Some home buyers have the mistaken impression that if they sell their homes when they move to another locality, or dispose of it for any other reasons, they are no longer liable for the mortgage payments and that liability for these payments is solely that of the new owners. Even though the new owners may agree in writing to assume liability for your mortgage payments, this assumption agreement will not relieve you from liability to the holder of the note which you signed when you obtained the loan to buy the property. Unless you are able to sell the property to a buyer who is acceptable to VA or to HUD/FHA and who will assume the payment of your obligation to the lender, you will not be relieved from liability to repay any claim which VA or HUD/FHA may be required to pay your lender on account of default in your loan payments. **The amount of any such claim payment will be a debt owed by you to the Federal Government.** This debt will be the object of established collection procedures.

**25. I, the Undersigned Borrower(s) Certify that:**

(1) I have read and understand the foregoing concerning my liability on the loan and Part III Notices to Borrowers.

(2) Occupancy: ( for VA only -- mark the applicable box)

[ ] (a) I now actually occupy the above-described property as my home or intend to move into and occupy said property as my home within a reasonable period of time or intend to reoccupy it after the completion of major alterations, repairs or improvements.

[ ] (b) My spouse is on active military duty and in his/her absence, I occupy or intend to occupy the property securing this loan as my home.

[ ] (c) I previously occupied the property securing this loan as my home. (for interest rate reductions)

[ ] (d) While my spouse was on active military duty and unable to occupy the property securing this loan, I previously occupied the property that is securing this loan as my home. (for interest rate reduction loans)

Note: If box 2b or 2d is checked, the veteran's spouse must also sign below.

(3) Mark the applicable box (not applicable for Home Improvement or Refinancing Loan) I have been informed that ($ _____ ) is :

[ ] the reasonable value of the property as determined by VA or;

[ ] the statement of appraised value as determined by HUD / FHA.

Note: If the contract price or cost exceeds the VA "Reasonable Value" or HUD/FHA "Statement of Appraised Value", mark either item (a) or item (b), whichever is applicable.

[ ] (a) I was aware of this valuation when I signed my contract and I have paid or will pay in cash from my own resources at or prior to loan closing a sum equal to the difference between the contract purchase price or cost and the VA or HUD/FHA established value. I do not and will not have outstanding after loan closing any unpaid contractual obligation on account of such cash payment;

[✓] (b) I was not aware of this valuation when I signed my contract but have elected to complete the transaction at the contract purchase price or cost. I have paid or will pay in cash from my own resources at or prior to loan closing a sum equal to the difference between purchase price or cost and the VA or HUD/FHA established value. I do not and will not have outstanding after loan closing any unpaid contractual obligation on account of such cash payment.

(4) Neither I, nor anyone authorized to act for me, will refuse to sell or rent, after the making of a bona fide offer, or refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny the dwelling or property covered by his/her loan to any person because of race, color, religion, sex, handicap, familial status or national origin. I recognize that any restrictive covenant on this property relating to race, color, religion, sex, handicap, familial status or national origin is illegal and void and civil action for preventive relief may be brought by the Attorney General of the United States in any appropriate U.S. District Court against any person responsible for the violation of the applicable law.

(5) All information in this application is given for the purpose of obtaining a loan to be insured under the National Housing Act or guaranteed by the Department of Veterans Affairs and the information in the Uniform Residential Loan Application and this Addendum is true and complete to the best of my knowledge and belief. Verification may be obtained from any source named herein.

(6) For HUD Only (for properties constructed prior to 1978) I have received information on lead paint poisoning.   [ ] Yes [✓] Not Applicable

(7) I am aware that neither HUD / FHA nor VA warrants the condition or value of the property

Signature(s) of Borrower(s) -- Do not sign unless this application is fully completed. Read the certifications carefully & review accuracy of this application.   Date

X _Olga F Nunez_         X _____         6/24/08

Federal statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the VA Secretary or the HUD/FHA Commissioner.

VA Form 26-1802a (3/98)                    page 2                    form HUD-92900-A   (06/2005)

## Borrower's Certificate:

The undersigned certifies that:

(a) I will not have outstanding any other unpaid obligations contracted in connection with the mortgage transaction or the purchase of the said property except obligations which are secured by property or collateral owned by me independently of the said mortgaged property, or obligations approved by the Commissioner;

(b) One of the undersigned intends to occupy the subject property, (note: this item does not apply if owner-occupancy is not required by the commitment);

(c) All charges and fees collected from me as shown in the settlement statement have been paid by my own funds, and no other charges have been or will be paid by me in respect to this transaction;

(d) Neither I, nor anyone authorized to act for me, will refuse to sell or rent, after the making of a bona fide offer, or refuse to negotiate for the sale or rental of or otherwise make unavailable or deny the dwelling or property covered by this loan to any person because of race, color, religion, sex, handicap, familial status or national origin. I recognize that any restrictive covenant on this property relating to race, color, religion, sex, handicap, familial status or national origin is illegal and void and any such covenant is hereby specifically disclaimed. I understand that civil action for preventative relief may be brought by the Attorney General of the United States in any appropriate U.S. District Court against any person responsible for a violation of this certificate.

Borrower'(s) Signature(s) & Date

Olga Nunez

*Olga E Nunez*                     6/24/08

## Lender's Certificate:

The undersigned certifies that to the best of its knowledge:

(a) The statements made in its application for insurance and in this Certificate are true and correct;

(b) The conditions listed above or appearing in any outstanding commitment issued under the above case number have been fulfilled;

(c) Complete disbursement of the loan has been made to the borrower, or to his/her creditors for his/her account and with his/her consent;

(d) The security instrument has been recorded and is a good and valid first lien on the property described;

(e) No charge has been made to or paid by the borrower except as permitted under HUD regulations;

(f) The copies of the credit and security instruments which are submitted herewith are true and exact copies as executed and filed for record;

(g) It has not paid any kickbacks, fee or consideration of any type, directly or indirectly, to any party in connection with this transaction except as permitted under HUD regulations and administrative instructions.

I, the undersigned, as authorized representative of                                                                    ,
mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

| Lender's Name WORLD ALLIANCE FINANCIAL First Financial Home Mortgage Corp. | Note: If the approval is executed by an agent in the name of lender, the agent must enter the lender's code number and type. | |
|---|---|---|
| Title of Lender's Officer Closer | Code Number  (5 digits) | Type |
| Signature of Lender's Officer *Merrill Johnson*   Date 6-24-08 | | |

FORM APPROVED
OMB NO. 2502-0265

| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT SETTLEMENT STATEMENT | B. TYPE OF LOAN  1. _X_ FHA  2. ___ FmHA  3. ____ CONV. UNINS.  4. ___ VA  5. ___ CONV. INS. |
|---|---|
| | 6. FILE NUMBER:                    7. LOAN NUMBER: |
| | 8. MORTGAGE INSURANCE CASE NUMBER: 095-0714323/952-255 |

C:  NOTE:  *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by settlement agent are shown. Items marked "(p.o.c)" were paid outside the closing; they are shown here for informational purposes and are not included in the Totals.*

D.  NAME OF BORROWER:
Olga Nunez

E.  NAME AND ADDRESS OF SELLER:

F.  NAME AND ADDRESS OF LENDER:
World Alliance Financial Corp.
3 Huntington Quadrangle 3rd Floor
Melville, NY 11747

G.  PROPERTY LOCATION:
9940 Southwest 155th Avenue
Miami, FL 33196

H.  SETTLEMENT AGENT:
Countywide Title Group, Inc

I.  SETTLEMENT DATE:
Closing Date:        June 24, 2008
Disbursement Date:   June 30, 2008

PLACE OF SETTLEMENT:
6175 NW 153rd Street Ste 100
Miami Lakes, FL 33015

| J.  SUMMARY OF BORROWER'S TRANSACTION | | K.  SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100.  GROSS AMOUNT DUE FROM BORROWER: | | 400.  GROSS AMOUNT DUE TO SELLER: | |
| 101.  Contract sales price | | 401.  Contract sales price | |
| 102.  Personal property | | 402.  Personal property | |
| 103.  Settlement charges to borrower (line 1400) | 24,857.75 | 403. | |
| 104.  Payoff  to:          Chase Home Finance | 155,735.46 | 404. | |
| 105.  Payoff  to: | | 405. | |
| 106.  Payoff  to: | | 406. | |
| 107.  Disbursement  to: | | 407. | |
| 108.  Disbursement  to: | | 408. | |
| 109.  Disbursement  to: | | *Adjustments for items paid by seller in advance* | |
| *Adjustments for items paid by seller in advance* | | 409.  City/town taxes             to | |
| 110.  County        to: | | 410.  County                to | |
| 111.  Assessments   to: | | 411.  Assessments            to | |
| 112.  Deposit | | 412. | |
| 120.  GROSS AMOUNT DUE FROM BORROWER | 180,593.21 | 420.  GROSS AMOUNT DUE TO SELLER | |
| 200.  AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | | 500.  REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201.  Deposit or earnest money | | 501.  Excess deposit (see instructions) | |
| 202.  Principal amount of new loan(s) | | 502.  Settlement charges to seller (line 1400) | |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204.  Closing Costs | 24,857.75 | 504.  Payoff of first mortgage loan | |
| 205.  Cash Portion of Initial Draw | 112,474.85 | 505.  Payoff of second mortgage loan | |
| 206.  Payoff  to:          Chase Home Finance | 155,735.46 | 506. | |
| 207.  Payoff  to: | | 507. | |
| 208.  Payoff  to: | | 508. | |
| 209.  Disbursement  to: | | 509. | |
| 210.  Disbursement  to: | | 510. | |
| 211.  Disbursement  to: | | *Adjustments for items paid by seller in advance* | |
| *Adjustments for items paid by seller in advance* | | 512.  City/town taxes            to | |
| 212.  City/County Taxes  to | | 513.  County | |
| 213.  County         to | | 514.  Assessments | |
| 214.  Assessments    to | | 515. | |
| 215. | | 516. | |
| 216.  Refund of Deposit: | 0.00 | 517. | |
| 217.  Cash due for Payoff(s): | | 518. | |
| 218.  Cash due for Closing Cost(s): | 0.00 | 519. | |
| 219. | | 520.  TOTAL REDUCTION AMOUNT DUE SELLER | |
| 220.  TOTAL PAID BY / FOR BORROWER | 293,068.06 | 600.  CASH AT SETTLEMENT TO / FROM SELLER | |
| 300.  CASH AT SETTLEMENT FROM/TO BORROWER: | | 601.  Gross amount due to seller (line 420) | |
| 301.  Gross amount due from borrower (line 120) | 180,593.21 | 602.  Less reduction in amount due seller (line 520) | |
| 302.  Less amounts paid by / for borrower (line 220) | 293,068.06 | 603.  CASH (      ) FROM (      ) TO BORROWER | |
| 303.  CASH ( ) FROM ( X ) TO  BORROWER | 112,474.85 | | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement (pg 1 and 2)

_Olga E Nunez_                    _6/24/08_
Borrower  Olga Nunez                    Date

_____        _____
Borrower                                Date

'WARNING:  It is a crime to knowingly make false statements to the United States on this or any similar form.  Penalties upon conviction can include a fine and 'imprisonment.  For details see:  Title 18 U.S. Code Section 1001 and Section 1010.

| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | | SETTLEMENT STATEMENT | | Page 2 of 2 |
|---|---|---|---|---|

FHA Case No. : ▮▮▮▮▮▮▮

### L.   SETTLEMENT CHARGES

| | | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| **700.  TOTAL SALES/BROKER'S COMMISSION:** | | | | | |
| based on price | $ | @ | %= | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701.  $ | | to | | | |
| 702.  $ | | to | | | |
| 703.  Commission paid at Settlement | | | | | |
| **800.  ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | | |
| 801.  Loan Origination Fee | 0.00 | to | First Financial Home Mortgage Corp. | 5,310.00 | |
| 802.  Discount Fee | | to | | | |
| 803.  Appraisal Fee | 0.00 | to | C.V. Appraisal Corp ($350 POC) | 0.00 | |
| 804.  Credit Report | 0.00 | to | CBC Innovis | 9.95 | |
| 805.  Lender's Inspection Fee | | to | | 0.00 | |
| 806.  Document Preparation Fee | 0.00 | to | Bay Docs | 75.00 | |
| 807.  Trust Review Fee | | to | | 0.00 | |
| 808.  Repair Administration Fee | 0.00 | to | | 0.00 | |
| 809.  Flood Certificate Fee | 0.00 | to | Wolter Klumer Financial | 19.20 | |
| 810.  Compliance Certificate | 0.00 | to | | 0.00 | |
| 811. | 0.00 | to | | 0.00 | |
| 812.  Lender Paid to Broker – YSP | | to | YSP to Broker ($ 4,762.36  POC) | ▮▮▮▮▮ | |
| 813.  Fee to Servicing Company | 0.00 | to | All Finance Mortgage | | |
| 814. | 0.00 | to | | 0.00 | |
| 815. | 0.00 | to | | 0.00 | |
| 816.  Counseling Fee | 0.00 | to | First Financial Home Mortgage Corp. | 75.00 | |
| **900.  ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | | |
| 901.  Interest From | | to | @        $/day | | |
| 902.  Mortgage Insurance Premium | | to | | 7,080.00 | |
| 903.  Hazard Insurance Premium | | years | Federated National Insurance | 3,594.00 | |
| 904.  Quoted first year expenses | | to | | 0.00 | |
| 905.  Flood Insurance | | to | Tower Hill Preferred Insurance | 373.00 | |
| **1000.  RESERVES DEPOSITED WITH LENDER** | | | | | |
| 1001.  Hazard Insurance | | months @ $ | | | |
| 1002.  Mortgage Insurance | | months @ $ | | | |
| 1003.  City Property Taxes | | months @ $ | | | |
| 1004.  County Property taxes | | months @ $ | | | |
| 1005.  Annual Assessments | | months @ $ | | | |
| **1100.  TITLE CHARGES** | | | | | |
| 1101.  Settlement or closing fee | 0.00 | to | Countywide Title Group, Inc | 1,140.00 | |
| 1102.  Abstract or title search | | to | Title Pushers | 130.00 | |
| 1103.  Title examination | 0.00 | to | | 0.00 | |
| 1104.  Title Insurance Binder | 0.00 | to | | 0.00 | |
| 1105.  Document Preparation | | to | | 0.00 | |
| 1106.  Notary fees | 0.00 | to | | 0.00 | |
| 1107.  Attorney's fees | 0.00 | to | | 0.00 | |
| (includes above items numbers:                ) | | | | | |
| 1108.  Title insurance | | to | Old Republic National | 1,845.00 | |
| (includes above items numbers:  ) | | | | | |
| 1109.  Lender's coverage | | $   354,000.00 | | | |
| 1110.  Owner's coverage | | | | | |
| 1111.  Title Endorsements | | to | Old Republic National | 234.50 | |
| 1112.  ALTA 8.1-6.2 | 0.00 | to | | | |
| 1113.  Deed Prep Fee | | to | Ceasar Mestre | 75.00 | |
| **1200.  GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | | |
| 1201.  Recording fees:  Deed ; | | Mortgage 147.50; | Releases | 147.50 | |
| 1202.  City/county tax/stamps  Deed ; | | | Mortgage 1,858.50 | 1,858.50 | |
| 1203.  State tax/stamps | Deed ; | | Mortgage 1,062.00 | 1,062.00 | |
| 1204.  Record CMA | | to | County Clerk | 10.00 | |
| 1205.  Record Quit Claim Deed | | to | County Clerk | 19.10 | |
| **1300.  ADDITIONAL SETTLEMENT CHARGES** | | | | | |
| 1301.  Survey | 0.00 | to | | 0.00 | |
| 1302.  Pest Inspection | 0.00 | to | | 0.00 | |
| 1303.  Courier Charge | | to | | 0.00 | |
| 1304.  Wire Transfer Fee | | to | | | |
| 1305.  Storage Fee | | to | Pagestream | 30.00 | |
| **1400.  TOTAL SETTLEMENT CHARGES** *(enter on lines 103, Section J and 502, Section K)* | | | | $24,857.75 | |

I have prepared the HUD-1 Settlement Statement                                                                                                  HUD-1-04/87

**World Alliance Financial Corp.**                          **By:**
Company                                                                        **Representative**

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received, and have been or will be disbursed, by the undersigned as part of the settlement of this transaction.

By: _____
Settlement Agent                                                                                    Date

WARNING:  It is a crime to knowingly make false statements to the United States on this or any similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see:  Title 18 U.S. Code Section 1001 and Section 1010.

# ADDENDUM TO HUD-1 SETTLEMENT STATEMENT

### CERTIFICATION OF BORROWER IN AN FHA-INSURED HECM
### (HOME EQUITY CONVERSION MORTGAGE) LOAN TRANSACTION

I have carefully reviewed the HUD-1 Settlement Statement, and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____
**Olga Nunez**                                                                    Date

### CERTIFICATION OF SETTLEMENT AGENT IN AN FHA-INSURED HECM
### (HOME EQUITY CONVERSION MORTGAGE) LOAN TRANSACTION

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received, and have been or will be disbursed, by the undersigned as part of the settlement of this transaction.

_____                    _____
Settlement Agent                                                                    Date

(The certifications contained herein may be obtained from the respective parties at different times or may be contained on separate addenda.)

**WARNING**: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see Title 18 U.S. Code Section 1001 and Section 101

## The Reverse Mortgage Analyst
Olga Nunez: Phone 305-388-1436

## Good Faith Estimate

1-year CMT – HECM-1T1
Property Value: $354,000.00
Maximum Claim Amount: $354,000.00
Applicant:    Olga Nunez
Property:    9940 Southwest 155th Avenue
            Miami, FL 33196

Date Printed: Jun 24,2008
Current Note Interest Rate: 4.320%
Estimated Closing Date: Jun 24,2008
Nearest Birthday Age: 88

Phone: 305-388-1436

The information provided below reflects estimates of the charges you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines or sections contained in the HUD-1 Settlement Statement which you will receive at settlement. The HUD-1 Settlement Statement will show you the actual cost for items paid at settlement.

| | | |
|---|---|---|
| 801 | Loan Origination Fee | $5,310.00 |
| 804 | Credit Report Fee | $9.95 |
| 805 | Counseling Fee | $75.00 |
| 806 | Doc Prep | $75.00 |
| 809 | Flood Certificate Fee | $19.20 |
| 813 | HECM Advisor Fee | $1,770.00 |
| 902 | Mortgage Insurance Premium | $7,080.00 |
| 903 | Hazard Insurance Premium | $3,594.00 |
| 905 | Flood Insurance | $373.00 |
| 1101 | Escrow or Settlement Fee | $1,140.00 |
| 1102 | Abstract or Title Search | $130.00 |
| 1108 | Title Insurance | $1,845.00 |
| 1111 | FL9 Endorsements | $234.50 |
| 1113 | Deed Prep Fee | $75.00 |
| 1201 | Recording Fees | $147.50 |
| 1202 | City/County Tax/Stamps | $1,858.50 |
| 1203 | State Tax/Stamps | $1,062.00 |
| 1204 | Record CMA | $10.00 |
| 1205 | Record Quit Claim Deed | $19.10 |
| 1305 | Storage Fee | $30.00 |
| 1400 | TOTAL SETTLEMENT CHARGES | $24,857.75 |

Broker may be paid a yield spread premium (YSP) of up to 3.5% or $10,257.38.
Any lifetime annuity or other insurance product you may purchase is not a required charge.

### This Good Faith Estimate is NOT a loan commitment.

We hereby acknowledge receipt of this document, the attached list of required providers of service, and a copy of " When Your Home Is On The Line: What You Should Know About Home Equity Lines of Credit."

_Olga E. Nunez_                    _6/24/08_
Olga Nunez            Date        Othoniel Gomez, Loan Officer
                                  First Financial Home Mortgage Corp.
                                  6175 NW 153 St. # 230
_____          Miami Lakes, FL 33014
                     Date

## The Reverse Mortgage Analyst

Olga Nunez: Phone 305-388-1436

### Reverse Mortgage Reports

June 24, 2008

**Prepared for:**
Olga Nunez
9940 Southwest 155th Avenue
Miami, FL 33196
305-388-1436

**Other Contact Person:**
RICARDO JIMENEZ
9940 SW 155 AVE
MIAMI, FL 33196
786-406-8369

**Prepared by:**
Enrique Pedraja
First Financial Home Mortgage Corp.
6175 NW 153 Street # 230
Miami Lakes, FL 33014
Phone: 305-817-9300

Here is your reverse mortgage closing package. Estimates are based on information you have provided, choices you have made, and various assumptions about the future, as explained in the reports.

*These pages were produced by computer software that meets "Model Specifications for Analyzing and Comparing Reverse Mortgages" developed under a grant from the U. S. Department of Housing and Urban Development to the AARP Foundation.*

**This packet includes the following estimates, final disclosures and loan documents:**

- **Principal Limit Lock Comparison** (the effect of two different loan rates)
- **Loan Estimates** compares the itemized costs and benefits of selected loans
- **Loan Amortization Schedule** presents year-by-year projections of your loan
- **Amortization Schedule Notes** shows how to interpret the schedule
- **Total Annual Loan Costs (TALC)** as specified by the Truth-in-Lending Act
- **HECM Print Screen** (your lender will give this page to HUD)

Please review these documents, disclosures and other pages. If you have questions, please call me at 305-817-9300.

Best Regards,

Enrique Pedraja
Loan Officer

## The Reverse Mortgage Analyst

Olga Nunez: Phone 305-388-1436

## Principal Limit Lock Summary

**Applicants:** **Olga Nunez**                                              **June 24, 2008**
9940 Southwest 155th Avenue
Miami, FL 33196

Thank you for applying to participate in Home Equity Conversion Mortgage (HECM) Loan Program. You may will receive higher benefits from your HECM loan if we are able to calculate its terms using the 10-year rate in effect on the date you applied for the loan rather than the rate in effect on the day your loan is closed. Please sign the accompanying Principal Limit Lock Disclosure so we can use this option if it benefits you.

The principal limit lock option can be used if your closing papers are ready and signed by you within 120 days of when HUD assigned a case number to your loan application. We estimate that the last day you are eligible for the principal limit lock is **Thursday, September 18, 2008**. The bold numbers below estimate the extra benefit you gain from the principal limit lock option. **For now, the estimated closing date rate is better for you.**

| | HUD Case Number | 095-0714323 | HECM Lending Limit | $354,000 |
| | Case Number Date | May 21,2008 | Home Appraisal | $354,000 |

| **Principal Lock Comparison** | Using Application Date | Using Estimated Closing | The Principal Lock Option can Add |
|---|---|---|---|
| Paper Signing Dates | May 21,2008 | Jun 24,2008 | |
| 10-year Rate | 3.86% | 3.86% | |
| Lender's Margin | 1.75% | 1.75% | |
| Expected Rate | 5.61% | 5.61% | |
| | | | |
| HECM Principal Limit | $296,652 | $296,652 | |
| Loan Fees and Costs | -17,778 | -17,778 | |
| Mortgage Insurance Premium | -7,080 | -7,080 | |
| Service Fee Set-aside | -3,584 | -3,584 | |
| Liens, Repairs, Upfront Draws | -268,210 | -268,210 | |
| **Your Remaining Available Funds** | $0 | $0 | |
| If you choose no Line-of-Credit: | | | |
| Home Tenure Income | $0 | $0 | |

It is understood and agreed that if this HECM Loan transaction is not closed and consummated in accordance with the terms and conditions of the attached Principal Limit Lock Disclosure and the closing instructions on or before the final Loan Closing Date, this page and the Principal Limit Lock Disclosure will be null and void and of no further effect.

SIGNATURE _Olga Ef Nunez_ DATE 6/24/08
                    Olga Nunez

SIGNATURE_____ DATE_____

Page 2 of 7

## The Reverse Mortgage Analyst

Olga Nunez: Phone 305-388-1436

| Loan Terms | HECM-1T1 | HECM-L2 | Fannie Mae |
|---|---|---|---|
| Program Description | 1-year CMT | LIBOR | HomeKeeper |
| Adjusting period | Monthly | Annual | Monthly |
| Interest rate index | 2.57% | 3.545% | 2.520% |
| Plus lender's margin | 1.75% | 3.100% | 3.400% |
| Initial loan interest rate | 4.32% | 6.645% | 5.875% |
| Plus mortgage insurance | 0.50% | 0.50% | – |
| Initial total loan rate | 4.82% | 7.145% | 5.875% |
| Initial creditline growth rate | 4.93% | 7.384% | |
| Lifetime cap on loan rate | 14.32% | 11.645% | 17.875% |
| HECM Expected Rate | 5.61% | 7.980% | – |
| Monthly Service Fee | $35.00 | $30.00 | $30.00 |
| Value of the home | $354,000.00 | $354,000.00 | $354,000.00 |
| Home value limit | $362,790.00 | $362,790.00 | $417,000.00 |
| Lesser of limit or home value | $354,000.00 | $354,000.00 | $354,000.00 |
| Loan principal limit | $296,652.00 | $258,066.00 | $227,802.54 |
| Less Service fee set-aside | $3,583.94 | $2,724.39 | $3,121.75 |
| Available principal limit | $293,068.06 | $255,341.61 | $224,680.79 |
| Less Financed Items | | | |
| Loan origination fee | $5,310.00 | $7,080.00 | $7,080.00 |
| Mortgage insurance | $7,080.00 | $7,080.00 | – |
| Other closing costs | $12,467.75 | $12,467.75 | $7,065.30 |
| Net Principal Limit | $268,210.31 | $228,713.86 | $210,535.49 |
| Total Liens & Debt | $155,735.46 | $155,735.46 | $155,735.46 |
| Program is short by | | – | – |
| Less Financed Liens & Debt | $155,735.46 | $155,735.46 | $155,735.46 |
| Less Lump-Sum Cash | $112,474.85 | $72,978.40 | $54,800.03 |
| Less Selected Creditline | $0.00 | $0.00 | $0.00 |
| Left for monthly advance | $0.00 | $0.00 | $0.00 |
| Monthly Advance | $0.00 | $0.00 | $0.00 |
| No more lien payments | +0.00 | +0.00 | +0.00 |
| Increase in monthly cash | $0.00 | $0.00 | $0.00 |
| Monthly Term | Tenure | Tenure | Tenure |
| Total Fees & Costs | $24,857.75 | $26,627.75 | $14,145.30 |

The figures on this page are estimates only, and are based on a variety of assumptions that are subject to change. These estimates are based on interest rates for the week of June 24th and program home value limits as of June 22, and the youngest borrower's birth date being 2/7/1920.

*Olga E Nunez*
Olga Nunez

6/24/08
Date

## The Reverse Mortgage Analyst

Olga Nunez: Phone 305-388-1436

### Loan Amortization Schedule

### HECM-1T1 Reverse Mortgage

**Assuming a 4.32% per year annual interest rate and 4.00% per year future home appreciation.**

| End of Year | Age | Unused Available Creditline | Annual Totals | | | | | End of Year Projections | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Creditline Draws | Loan Advances | Service Fees | Accrued Interest | Accrued MIP | Loan Balance | Home Value | Net Home Value | Net Equity |
| 0 | 88 | 0 | -- | -- | -- | -- | 7,080 | 293,068 | 354,000 | 329,220 | 36,152 |
| 1 | 89 | 0 | 0 | 0 | 420 | 12,952 | 1,499 | 307,940 | 368,160 | 342,389 | 34,449 |
| 2 | 90 | 0 | 0 | 0 | 420 | 13,609 | 1,575 | 323,544 | 382,886 | 356,084 | 32,540 |
| 3 | 91 | 0 | 0 | 0 | 420 | 14,298 | 1,655 | 339,917 | 398,202 | 370,328 | 30,410 |
| 4 | 92 | 0 | 0 | 0 | 420 | 15,022 | 1,739 | 357,098 | 414,130 | 385,141 | 28,043 |
| 5 | 93 | 0 | 0 | 0 | 420 | 15,780 | 1,826 | 375,125 | 430,695 | 400,546 | 25,422 |
| 6 | 94 | 0 | 0 | 0 | 420 | 16,577 | 1,919 | 394,040 | 447,923 | 416,568 | 22,528 |
| 7 | 95 | 0 | 0 | 0 | 420 | 17,412 | 2,015 | 413,887 | 465,840 | 433,231 | 19,344 |
| 8 | 96 | 0 | 0 | 0 | 420 | 18,289 | 2,117 | 434,713 | 484,473 | 450,560 | 15,848 |
| 9 | 97 | 0 | 0 | 0 | 420 | 19,208 | 2,223 | 456,564 | 503,852 | 468,583 | 12,018 |
| 10 | 98 | 0 | 0 | 0 | 420 | 20,174 | 2,335 | 479,493 | 524,006 | 487,326 | 7,833 |
| 11 | 99 | 0 | 0 | 0 | 420 | 21,186 | 2,452 | 503,551 | 544,967 | 506,819 | 3,268 |
| 12 | 100 | 0 | 0 | 0 | 420 | 22,249 | 2,575 | 528,795 | 566,765 | 527,092 | 0 |
| 13 | 101 | 0 | 0 | 0 | 420 | 23,364 | 2,704 | 555,283 | 589,436 | 548,176 | 0 |
| 14 | 102 | 0 | 0 | 0 | 420 | 24,534 | 2,840 | 583,077 | 613,013 | 570,103 | 0 |
| 15 | 103 | 0 | 0 | 0 | 420 | 25,761 | 2,982 | 612,240 | 637,534 | 592,907 | 0 |

**Be sure to review the Amortization Schedule Notes that accompany this page.**

# The Reverse Mortgage Analyst

Olga Nunez: Phone 305-388-1436

## Amortization Schedule Notes

The amortization schedule projects a single loan into the future based on the payment plan and any line-of-credit draws that you have selected. The key assumptions in making the projections are the rate at which your home value would grow (its future appreciation rate), and the interest rate that would be charged on your loan.

- **Year 0** is the "closing" date, when you sign the loan documents to begin the loan.

- **Loan Advances** equals the total of all scheduled monthly payments to you each year if you selected a tenure or term payment plan.

- **Service Fees** are the annual total of all monthly servicing fees each year.

- **Accrued Interest** equals the amount of interest added to your loan balance each year.

- **Accrued MIP** equals the amount of monthly Mortgage Insurance Premium added to your loan balance each year. Initial Upfront MIP is shown in the Year 0 row.

- **Loan Balance** includes cash to you plus all loan costs to date.

- **Home Value** equals the future value of your home if it appreciates at 4.00% per year.

- **Net Home Value** is your projected future home value less 7% in estimated selling costs.

- **Net Equity** equals Net Home Value minus Loan Balance, or the amount of equity that you would retain if the home were sold to repay the loan at this time.

- **Note:** The approximate amount you would owe upon sale of the home is the Loan Balance or Net Home Value, whichever is less. If your Unused Available creditline is greater than your Net Home Value, draw it all before selling your home.

*Olga E Nunez*
Olga Nunez

*6/24/08*
Date

## The Reverse Mortgage Analyst

Olga Nunez: Phone 305-388-1436

### Total Annual Loan Cost

| LOAN TERMS: | | INITIAL LOAN CHARGES: | |
|---|---|---|---|
| Age of borrower: | 88 | Closing costs: | $17,777.75 |
| Appraised property value: | $354,000 | | |
| Initial interest rate: | 4.320% | Mortgage insurance premium: | $7,080.00 |
| | | Annuity cost: | None |
| | | MONTHLY LOAN CHARGES: | |
| | | Servicing fee: | $35.00 |
| | | Mortgage insurance: | 0.5% annually |
| Initial draw: | $268,210.31 | OTHER CHARGES: | |
| Initial line of credit: | $0.00 | None | |
| | | REPAYMENT LIMITS: | |
| | | Net proceeds estimated at 93% | |
| | | of projected home sale. | |

| Total Annual Loan Cost Rate | | | | |
|---|---|---|---|---|
| Assumed | Disclosure Periods | | | |
| Annual Appreciation | 2-year loan term | 3-year loan term | 5-year loan term | 7-year loan term |
| 0% | 9.83% | 7.07% | 4.18% | 2.97% |
| 4% | 9.83% | 8.22% | 6.94% | 6.39% |
| 8% | 9.83% | 8.22% | 6.94% | 6.39% |

The cost of any reverse mortgage loan depends on how long you keep the loan and how much your home appreciates in value. Generally, the longer you keep a reverse mortgage, the lower the Total Annual Loan Cost Rate will be.

This table shows the estimated cost of your reverse mortgage loan, expressed as an annual rate. It illustrates the cost for four loan terms: 2 years, half of life expectancy for someone your age, that life expectancy, and 1.4 times that life expectancy. The table also shows the cost of the loan assuming the value of your home appreciates at three different rates: 0%, 4%, and 8%.

The Total Annual Loan Cost Rates in this table are based on the total charges associated with this loan. These charges typically include principal, interest, closing costs, annuity costs, mortgage insurance premiums, and servicing costs (but not disposition costs - costs when you sell the home).

The rates in this table are estimates. Your actual cost may differ if, for example, the amount of your loan advances varies or the interest rate on your mortgage loan changes. You may receive projections of loan balances from counselors or lenders that are based on an expected average mortgage rate that differs from the initial interest rate.

## SIGNING AN APPLICATION OR RECEIVING THESE DISCLOSURES
## DOES NOT REQUIRE YOU TO COMPLETE THIS LOAN

X _Olga E Nunez_    _10/24/08_
Olga Nunez                Date

Page 6 of 7

## The Reverse Mortgage Analyst
Olga Nunez: Phone 305-388-1436

### HECM Print Screen

The first box below is a simulation of the FHA HECM software's "Print Screen". HUD software does **not** allow for MIP paid in cash, so we net any cash MIP portion against Other Closing Costs. If the result is a negative number, the word ERROR will appear in the table where FINANCED usually appears.

| 24 Jun 2008 | Federal Housing Administration | | 2:39:45 PM |
|---|---|---|---|
| | Home Equity Conversion Mortgage Insurance (HECM) V1.2 | | |
| | | | |
| Borrower Name/Case Number: | Olga Nunez | | Refinance:  No |
| | | Variables | Calculated |
| Date of Closing MM/DD/YYYY: | | 06/24/2008 | 06/24/2008 |
| Borrower's Birth Date MM/DD/YYYY: | | 02/07/1920 | Age: 88 |
| Expected Interest Rate: | | 5.610 | 5.610% |
| Property Appraised Value: | | $354,000.00 | $354,000.00 |
| Maximum Claim Amount: | | $354,000.00 | $354,000.00 |
| Principal Limit Factor: | | | 0.838 |
| Principal Limit: | | | $296,652.00 |
| Upfront Premium: | | FINANCED | $7,080.00 |
| Other Closing Costs: | | $17,777.75 | $17,777.75 |
| Initial Advance: | | $268,210.31 | $268,210.31 |
| Monthly Servicing Fee: | | $35.00 | $3,583.94 |
| Net Principal Limit: | | | $0.00 |
| Line of Credit + Repairs + 1st-yr Exp.: | | CALCULATE | $0.00 |
| Monthly Payment: | | $0.00 | $0.00 |
| Length of Term: | | TENURE | TENURE |

| Needed for TALC Calculation: | | |
|---|---|---|
| Initial Interest Rate: | 4.320% | |
| Cash Closing Costs: | $0.00 | HUD-1 Line 207 |
| **Line of Credit Includes:** | | |
| Actual Line of Credit | $0.00 | |
| Repair Set-aside | $0.00 | |
| First-Year Expense Set-aside | $0.00 | HUD-1 Lines 903-904 |
| Total Line of Credit above | $0.00 | |
| **Initial Advance above includes:** | | |
| Upfront Cash to Borrower | $112,474.85 | HUD-1 Line 205 |
| Cash for Financed Liens / Disbursements | $155,735.46 | HUD-1 Lines 210-215 |
| Other Amounts Paid on Behalf of Borrower | $0.00 | HUD-1 Lines 208-209 |
| Total Initial Advance above | $268,210.31 | |
| **Deposit Returned to Borrower** | $0.00 | HUD-1 Line 216 |

X *Olga E Nunez*                    06/24/08
Olga Nunez                          Date                                    Date

Page 7 of 7

## HOME EQUITY CONVERSION MORTGAGE
## FEDERAL LOAN CLOSING TRUTH-IN-LENDING
## DISCLOSURE STATEMENT

FHA Case Number: ████████████

In this Disclosure, the words you, your, and yours mean the Borrower(s), and the words we, us and our mean **World Alliance Financial Corp..**

The Home Equity Conversion Mortgage ("HECM" or "Account") will be governed by two Notes, a Loan Agreement, and two Mortgages or Deeds of Trust (the "First Security Instrument" and the "Second Security Instrument", collectively, the "Security Instruments"). You will be able to obtain loan advances under a set schedule and/or by requesting advances up to the available Principal Limit.

**SECURITY INTEREST:** You are giving us and the Department of Housing and Urban Development ("HUD") a security interest in the residential Property located at **9940 Southwest 155th Avenue, Miami, FL 33196** (the "Property").

You could lose this Property if you do not meet the obligations in the Note(s) and Loan Agreement with us.

**POSSIBLE ACTIONS:** Under certain conditions discussed below, we may take certain actions including terminating your Account and accelerating your outstanding balance, suspending your credit privileges, and implementing certain changes to the Notes, Security Instruments and Loan Agreement.

We can terminate your Account and require immediate payment of the entire outstanding balance in one payment if:
* All of the Borrowers have died.

* All of the Borrowers have sold or conveyed title to the Property.

* The Property is no longer the principal residence of at least one Borrower.

* No Borrower maintains the Property as a principal residence for a period exceeding 12 consecutive months because of physical or mental illness.

* The Borrower violates any other covenants of the Security Instruments and has refused or is unable to comply with the violated conditions of the Security Instruments.

We can refuse to make additional extensions of credit during any period in which the following are in effect:
* The outstanding balance equals the credit limit ("Principal Limit").

* We have notified you that we will require immediate payment of the entire outstanding balance due to the occurrence of one of the events of termination listed above.

* The initial repairs required to bring the Property up to the property standards required by HUD are not completed by the time required in the Repair Rider to the Loan Agreement.

* We determine on the basis of title evidence that the Property securing the Account is encumbered by any liens that jeopardize the first lien status of the First Security Instrument or the second lien status of the Second Security Instrument, or if you refuse to execute any document necessary to extend the first and second lien status to an additional maximum principal balance or for an additional number of years.

* A petition for bankruptcy by or against you is filed.

• You have paid the Notes in full.

We are permitted to make certain changes to the terms of the Account. We may make changes to the Account if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of the Account, if the change is insignificant (such as changes relating to our data processing system), or if the change involves the substitution of the index and margin if the current index becomes unavailable (as described below).

**MINIMUM PAYMENT REQUIREMENTS:** You can obtain advances of credit under one of several "payment plans" available under the HECM program. The length of time during which you can obtain advances depends upon the payment plan that you select. As long as the Account is not due and payable under the conditions set forth above, you may obtain advances under the following payment plans:
(a) Tenure plan: Under this plan, you will receive equal monthly payments from us for as long as you occupy the property as a principal residence.

Truth-in-Lending

(b)     Term plan: Under this plan, you will receive equal monthly payments from us for a fixed period that you select.

(c)     Line of Credit plan: Under this plan, you will receive advances in unscheduled payments or in installments, at times and in amounts that you choose until the line of credit is exhausted.

(d)     Modified Term or Tenure plan: Under these plans, you may combine a line of credit with monthly payments. In exchange for reduced monthly payments, you will set aside a specified amount of money at closing for a line of credit, on which you can draw until the line of credit is exhausted.

The period during which you can obtain advances (the "Draw Period") is, therefore, indefinite under the Tenure and Line of Credit or Modified Term or Tenure plans. You can choose the length of the Draw Period under the Term or Tenure plan. [If you have chosen a Term plan, you have elected a Draw Period of N/A years and N/A months.] You can switch from one plan to another at any time during the life of your Account. If you elect to change your payment plan, the length of your Draw Period may also change.

Repayment of all amounts outstanding under your HECM will be due in one single payment; therefore, there will be no repayment period. Your payment will be due when: (a) a Borrower dies and the Property is not the principal residence of at least one surviving Borrower, (b) a Borrower conveys all of his or her title to the Property (other than a transfer of the Borrower's title into a trust that satisfies HUD's requirements and a transfer of title to the Property from such a trust to the Borrower) and no other Borrower retains title to the Property in fee simple or on a leasehold interest, or (c) upon approval by the Secretary of Housing and Urban Development, if: (i) the Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower, (ii) for a period longer than 12 consecutive months a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower, or (iii) an obligation of the Borrower under the Security Instruments is not performed.

Your minimum payment will be equal to the amount of (1) all advances you have obtained, (2) all advances that we have made pay for repairs, escrows, monthly mortgage insurance premiums, servicing fees and other charges that you authorize us to pay or for which we are permitted to advance funds under the Notes, Security Instruments and Loan Agreement, (3) all interest that has accrued on the amount outstanding from time to time and (4) any other fees or charges that are due under your Notes, Security Instruments and Loan Agreement.

**MINIMUM DRAW AND BALANCE REQUIREMENTS:** The amount of your advances and any limitations on those advances will depend upon the payment plan that you select. If you have selected a Tenure or Term plan or a Modified Term or Tenure plan, then the amount of your advances (payments to you) will be set at **$0.00** and will be paid to you on a monthly basis. If you have selected a Line of Credit plan or a Modified Term or Tenure plan (payment plans with monthly payments combined with a line of credit), there are no limitations on the amount of an advance or the number of advances you may obtain under the line of credit (as long as you remain within your Principal Limit). You may change the type of payment plan throughout the life of the Account (including switching to a Line of Credit plan). There are no minimum outstanding balance requirements under the Account.

**FINANCE CHARGES:**
**Interest Portion of the Finance Charge**
Each advance made to you or on your behalf under your HECM will be subject to a Finance Charge beginning on the day after each advance is made. A Finance Charge will continue to be assessed on the outstanding balance under your HECM until the entire outstanding balance and all interest and fees due under the Notes, Security Instruments and Loan Agreement are paid.

The interest portion of the Finance Charge on your Account is computed by (i) calculating the Finance Charge on the balance existing at the beginning of each month, taking into consideration any payments or credits to your account, (ii) calculating the Finance Charge on each advance made to you or on your behalf during the month and (iii) adding all of these sums together. We start with the outstanding principal balance on your Account at the beginning of each month, which includes Finance Charges from the prior month (the "Outstanding Principal Balance"). At the end of each month, we multiply the Outstanding Principal Balance by the then-current Annual Percentage Rate and then divide the result of this calculation by 12 (the "Monthly Periodic Rate"). At the end of each month in which any advances or payments have been made to you or on your behalf, we multiply the amount of the advance or payment by the number of days remaining in the month after that advance or payment was made (not including the day it was made) and then multiply this amount by the then-current Annual Percentage Rate and divide the result of this calculation by 365 (the "Daily Periodic Rate"). This calculation is repeated for each advance or payment made to you or on your behalf during the month. The sum of the final result of these calculations equals the interest portion of your Finance Charge for the month. Advances made to pay fees for Finance Charges due under the Account will also accrue Finance Charges as described above.

**Mortgage Insurance Premiums**
In addition, mortgage insurance premiums ("MIP"), which are a Finance Charge, are computed by calculating the MIP on the Outstanding Principal Balance, calculating the MIP on each advance made to you or on your behalf during the month, and then adding all of these sums together. At the end of each month, we multiply the Outstanding Principal Balance by 0.5% and then divide the result of this calculation by 12 (the "MIP Monthly Periodic Rate"). At the end of each month in which any advances have been made to you or on your behalf, we multiply the amount of the advance by the number of days remaining in the month after that advance was made, (not including the day the advance was made) and then multiply this amount by the 0.5% and divide the result of this calculation by 365 (the "MIP Daily Periodic Rate"). This calculation is repeated for each advance made to you or on your behalf during the month. The sum of the final result of these calculations equals the mortgage insurance portion of your Finance Charge for the month. The MIP Monthly Periodic Rate applicable to your Account to calculate the mortgage insurance premium on the Outstanding Principal Balance is 0.041667%. The MIP Daily Periodic Rate applicable to your Account to calculate the mortgage insurance premium on each advance made to you or on your behalf during the month is 0.001370%. The Corresponding **Annual Percentage Rate** to these MIP Periodic Rates is 0.5%.

**Additional Finance Charges**
A Finance Charge of $35.00 for the servicing of your Account will be imposed each month until your HECM is repaid. Another **Finance Charge** in an amount not to exceed that determined by the Secretary will be imposed each time you elect to change your payment plan. You must also pay at settlement an Origination Fee and an Initial Mortgage Insurance Premium, which are **Finance Charges**. These fees must be paid in the amounts disclosed in the "Fees and Charges" section below.

_ (The following paragraph is applicable only if the box at left is checked).

Because repairs that are necessary to bring the Property up to HUD's Minimum Property Standards will be completed after closing and because advances from the Account will be used to pay for these repairs, a Repair Administration Fee of **0.00**, which is a **Financed Charge**, will be imposed at settlement.

**RATE CHANGES:** The Calculation of rate changes will depend on whether you select an annually adjustable or monthly adjustable variable rate account. The paragraph next to the checked box applies to your Account. __ The Annual Percentage Rate for the interest portion of your Finance Charge may increase or decrease annually based upon changes in the Weekly Average Yield on United States Treasury Securities Adjusted to a Constant Maturity of One Year("Treasury Securities Index").However, your first rate change can occur between twelve and eighteen months after the date of closing. Rate changes can occur every twelve months there after. To determine the Annual Percentage Rate that will apply to your Account, we add a margin of the value of the Treasury Securities Index.However,the Annual Percentage Rate cannot change by more than 2. percentage points at each rate change or by more than 5. percentage points over the life of the Account.Increases in the Annual Percentage Rate will result in larger advances made to pay the increased accrued interest portion of the Finance Charge and a larger Outstanding Balance..

   **X** The Annual Percentage Rate for the interest portion of your Finance Charge may increase or decrease monthly based upon changes in the Weekly Average Yield on United States Treasury Securities Adjusted to a Constant Maturity of OneYear("Treasury Securities Index").However your first rate change can occur on the first day of the second month after closing.Rate changes can occur every month thereafter.To determine the Annual Percentage Rate that will apply to your Account,we add a margin to the value of the Treasury Securities Index.There are no limits on the amount of the rate change each month,however,the Annual Percentage Rate cannot increase by more than 10.% over the life of the Account.Increases in the Annual Percentage Rate will result in larger advances made to pay the increased accrued interest portion of the Finance Charge and a larger Outstanding Balance..

In the event the Index is no longer available, we will choose a new index and margin. The new index will have an historical movement substantially similar to the original index and the new index and margin will result in an Annual Percentage Rate that is substantially similar to the rate in effect at the time the original index becomes unavailable.

The initial Monthly Periodic Rate applicable to your Account to calculate the interest portion of the Finance Charge on the Outstanding Principal Balance is **0.360000%**. The initial Daily Periodic Rate applicable to your Account to calculate the interest portion of the Finance Charge on each advance or payment made to you or on your behalf during the month is **0.011836%**. The Corresponding **Annual Percentage Rate** to these periodic rates (relating to the interest portion of the Finance Charge) is 4.320%. The Margin, which is added to the value of the Index, will be **1.750%**. The Annual Percentage Rate includes only interest and not other costs.

**MAXIMUM RATE:** The maximum Annual Percentage Rate (relating to the interest portion of the Finance Charge) that can apply to your Account is **14.320%**.

**NEGATIVE AMORTIZATION:** Under the HECM, you do not make any payments until one of the

conditions of termination described above occurs. Therefore, principal, along with the Finance Charges and other charges that accrue during the life of your HECM, are not paid as they are advanced or accrue, and "negative amortization" will occur. Negative amortization, under which the advances of credit and accrued Finance Charges and other charges are added to your outstanding loan balance, will increase the amount you owe us and reduce your equity in your home.

**TAX DEDUCTIBILITY:** You should consult a tax advisor regarding the deductibility of interest and charges for the Account.

**FEES AND CHARGES:** You must pay certain charges in connection with this Account as follows:
    (a)**Finance Charges:** You must pay the following **Finance Charges** in connection with the opening of your Account at settlement:

| | |
|---|---:|
| (1) Origination Fee | 5,310.00 |
| (2) Origination Fee (Other) | 0.00 |
| (2) Mortgage Insurance Premium | 7,080.00 |
| (3) Repair Administration Fee | 0.00 |
| (4) Courier Fee | 0.00 |
| (5) Counseling Fee | 75.00 |

(b)    Settlement Costs: You must pay the following charges in connection with the opening of your Account:

| | |
|---|---:|
| (1) Title Insurance Premium | 1,845.00 |
| (2) Recording Fees | 147.50 |
| (3) Appraisal Fees | 0.00 |
| (4) Credit Report Fee | 9.95 |
| (5) Escrow Closing Fee | 1,140.00 |
| (6) Document Preparation | 0.00 |
| (7) Notary Fee | 0.00 |
| (8) Termite Inspection/Pest Control Fee | 0.00 |
| (9) Endorsement Fee | 234.50 |
| (10) Flood Certificate | 19.20 |
| (11) Broker Fee | 0.00 |
| (13) Compliance Inspection | 0.00 |
| (14) Hazard Insurance | 3,594.00 |
| (15) Abstract or Title Search | 130.00 |
| (16) Title Examination | 0.00 |
| (17) Title Insurance Binder | 0.00 |
| (18) Attorney Fee | 0.00 |
| (19) City County Tax Stamps | 1,858.50 |
| (20) State Tax Stamps | 1,062.00 |
| (21) Survey | 0.00 |
| (22) Lender's Inspection Fee | 0.00 |
| (23) Doc Prep | 75.00 |
| (24) | |
| (25) ALTA 8.1-6.2 | |
| (26) Deed Prep Fee | 75.00 |
| (27) Record CMA | 10.00 |
| (28) Record Quit Claim Deed | 19.10 |
| (29) Wire Transfer Fee | |
| (30) Storage Fee | 30.00 |
| (31) Quoted first year expenses | 0.00 |
| (32) Flood Insurance | 373.00 |
| (33) | 0.00 |
| (34) | 0.00 |

**PROPERTY INSURANCE:** Property hazard insurance is required. You may obtain such insurance from any source you want that is acceptable to us.

---

### YOUR BILLING RIGHTS
### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in Case of Errors or Questions About Your Statement**
If you think your statement is wrong, or if you need more information about a transaction on your Statement, write us [on a separate sheet] at:

**World Alliance Financial Corp.**
**3 Huntington Quadrangle 3rd Floor**
**Melville, NY 11747**

Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

* Your name and Account number.
* The dollar amount of the suspected error.
* Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**
We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the statement was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including Finance Charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your statement that are not in question.

If we find that we made a mistake on your statement, you will not have to pay any Finance Charges related to any questioned amount. If we didn't make a mistake, you may have to pay Finance Charges, and you will have to make any missed payments in the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your statement. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

Although all of your billing error rights apply, because of the way the Account is structured, some of the requirements discussed above (e.g. regarding payments to us) may not be relevant to the HECM.

I/We hereby acknowledge receipt of the Home Equity Conversion Mortgage Federal Truth-in-Lending Disclosure Statement and agree to its terms.

*Olga Enuñez*
**Olga Nunez (Borrower)**

**Aleida C Nunez, as Remainderman**

**Certificate of
HECM Couseling**

U.S. Department of Housing
and Urban Development
Office of Housing

OMB No. 2502-0524 (expires 9/30/2007)

Provision of this information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless the form has a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

Homeowner(s) Name(s):

Olga E. Nunez

Property Address City/State/Zip

9940 SW 155th Ave , Miami, FL 33196

The U.S. Department of Housing and Urban Development (HUD) required that homeowne(s) interested in pursuing a Home Equity Conversion Mortgage (HECM) receive information about the implications of and alternatives to a reverse mortgage. The HECM counselor must adhere to all of FHA's guidelines regarding information that must be provided to the potential HECM mortgagor and must tailor the session to address the unique financial circumstances of the household being counseled.

**Counselor Certification:**
In accordance with Section 255 of the National Housing Act and 24CFR 206.41, I have discussed in detail the following items with the above referenced homeowner(s)

1. Options other than a Home Equity Conversion Mortgage that are available to the homeowner(s), including other housing, social service, health and financial options.
2. Other home equity conversion options that are or may become available to the homeowner(s), such as other reverse mortgages, sale-leaseback financing, deferred payment loans, and property tax deferral.
3. The financial implications of entering into a Home Equity Conversion Mortgage.
4. A disclosure that a Home Equity Conversion Mortgage may have tax consequences, affect eligibility for assistance under Federal and State programs, and have an impact on the estate and heirs of the homeowner(s).
5. Whether the homeowner has signed a contract or agreement with an estate planning service firm that requires, or purports to require, the mortgagor to pay a fee on or after closing that may exceed amounts permitted by the Secretary or in Part 206 of the HUD regulations at 24 CFR.
6. If such a contract has been signed, the extent to which services under the contract may not be needed or may be available at nominal or no cost from other sources, including the mortgagee.
7. The Home Equity Conversion Mortgage will be due and payable when no remaining borrower lives in the mortgaged property, or when any other covenants of the mortgage have been violated. (Borrowers are those parties who have signed the Note and Mortgage or Deed of Trust.)

I hereby certify that homeowner(s) listed above have received counseling according to the requirements of this certificate and the standards of the U.S. Department of Housing and Urban Development, as described in mortgagee letters, handbooks, regulations, and statute. This interview was held:  __ Face-to-Face  X  Telephone and the amount of time required to cover the above items was as follows: 1 hr  .

| Counselor's Name (Printed):<br>Chanel Tobon | HUD-Approved Counseling Agency Name:<br>Credit Card Management Services, Inc. | |
|---|---|---|
| Counselor's Name (Signature & Date) 5-19-08 | Address (City/State/Zip)<br>4611 Okeechobee Blvd., Suite 114,<br>West Palm Beach, FL 33417 | |
| x *Chanel Tobon* | Telephone No:<br>561-472-8000 | Agency Employer Identification No:<br>31-1483386 |

**HomeOwner Certification:**
I/we hereby certify that I/we have discussed the financial implications of and alternatives to a HECM with the above Counselor. I/we understand the advantages and disadvantages of a HECM and each type of payment plan, as well as the costs of a HECM and when the HECM will become due and payable. This information will enable me/us to make more informed decisions about whether I/we want to proceed with obtaining a HECM.

Homeowner Signature & Date:                            Homeowner Signature & Date:

x *Olga E. Nunez*    5/19/08         x

(All homeowners shown on the deed must sign the mortgage and this counseling certificate.)

Date Counseling Completed:     05/19/2008

Certificate Expiration Date:     11/15/2008

(180 days from date HECM counseling completed)

form HUD-92902 (9/2006)