UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                                                          Case No.: 17-21018-LMI

Aleida C. Nunez,                                                         Chapter 13

      Debtor.
_____/

### MOTION TO ALLOW PAROL EVIDENCE TO CLARIFY THE AMBIGUITIES FOUND IN THE MORTGAGE HELD BY REVERSE MORTGAGE SOLUTIONS AND APPROVING ATTORNEYS' FEES

    **COMES NOW** the Debtor, **ALEIDA C. NUNEZ**, by and through her undersigned counsel and moves this Honorable Court for an Order allowing parol evidence to clarify the ambiguities found in the mortgage held by Reverse Mortgage Solutions (the "Creditor") and as grounds therefore would show:

### STATEMENT OF FACTS

1. The Subject Property located at 9940 SW 155 Avenue, Miami, FL 33196 was purchased in July of 2005 by the Debtor's mother, Olga Nunez.

2. Mrs. Nunez added the Debtor to the title of the property, by way of a quit claim deed, in December of 2005 as evidenced by the quit claim deed recorded in OR Book 24099, Page 3226 of the Public Records of Miami-Dade County, Florida.

3. The Debtor's husband saw a television advertisement with regard to reverse mortgages and contacted World Alliance Financial Corp., or their agents. The agent made an appointment to meet with the Debtor and her mother. Two individuals, a man and a woman came to the Debtor's home for a very brief visit offering to give a reverse

Aleida C. Nunez  
Case No: 17-21018-LMI  
Page 2

mortgage on the property to the Debtor and her mother. World Financial paid off the mortgage on the property in the amount of $155,726.96 to Chase Home Finance. World Financial charged $24,866.25 in additional settlement charges. The mortgage with Chase Home Finance was current.

4. In June of 2015 the Consumer Financial Protection Bureau prepared a report regarding reverse mortgages. On page two (2) of the report, it states, "[r]everse mortgage advertisements, which are marketed to older homeowners, are found across many of the major media channels in the United States, including television, radio, print, and internet. In preparing the report the Bureau reviewed advertisements and conducted one-on-one interviews with homeowners, age 62 and older to explore their impressions of the advertisements."

5. The findings of the report were as follows: "Among the advertisements we collected, on their face, many contained confusing, incomplete, and inaccurate statements regarding borrower requirements, government insurance, and borrower risks. Furthermore, after viewing ads in our focus groups, many consumers were confused or had misconceptions about important features and terms of reverse mortgage loans. For example, some consumers struggled to understand that reverse mortgages are loans that must be repaid with interest. Consumers also often misinterpreted the role of the federal government in the reverse mortgage market as providing consumer protections that are not actually offered." The Bureau found that incomplete or inaccurate statements made in advertisements about reverse mortgages can pose serious risks to older Americans.

6. The Bureau found that heightened concerns regarding the advertisements stating they frequently did not describe all of the details of the particular service or product being advertised and specifically referred to the "incompleteness of reverse mortgage ads". Citing CFPB, Reverse Mortgages, Report to Congress dated June 28, 2012 the report states, "They are very complex financial products with costs and risks that can be difficult for even sophisticated consumers to estimate and understand." Page 4. The report also stated, "Several of these consumers believed that reverse mortgages were provided by the government and that therefore repayment would not be required." Page 6.

7. Specifically with regard to the ads, the participants in the CPFB study, ". . . came away with the impression that a main benefit of a reverse mortgage was the ability to remain in their homes "as long as they want" based on ads that said, "the title and deed remain in their name." Other consumers said they valued the idea that having a reverse mortgage meant they could never lose their home." The instant case is a perfect example of the Debtor believing the title and deed would remain in her name and that she could never lose her home. The report on page 7 found, "Advertisements that create the impression that there is no risk can thus be misleading." The Debtor was on title to the property, saw her name on the papers and understood that she was a Borrower on the instant loan.

8. On June 24, 2008, the Debtor and her mother, Olga Nunez, jointly executed an adjustable Rate Home Equity Conversion Mortgage (the "Mortgage"), recorded on July 14, 2008, in OR Book 26476, Page 3178, of the Public Records of Miami-Dade County, Florida.

9. On September 5, 2015, Creditor filed a Complaint and initiated foreclosure proceedings against the Debtor and her mother for failure to maintain taxes and insurance on the Subject Property.

10. On August 30, 2017, the Debtor filed the instant case and proposed to cure the amounts owed to Creditor for taxes and insurance.

11. On January 23, 2020, the District Court entered an Order which on Page 7, states, "[a]s the Court cannot conclude that it is plain and unambiguous that the Security Instrument treats Debtor as a "borrower," it is still appropriate to apply the doctrine of mutual construction, notwithstanding the superseding opinion in *Palmero*. The Court further notes that where the *Palmero* court found certain covenants would only be accurate if Mrs. Palmero was a borrower, here, "if the Security Instrument is interpreted out of context with the larger transaction, . . .the Security Instrument would nullify the terms of the Note." (DE 28)," *Id.* at Page 7.

12. In response, the Debtor brought forth an appeal which was dismissed by the Eleventh Circuit. A copy of the dismissal is located at DE#170.

13. While the Debtor believes that the *Palmero* decision would be determinative of the issue regarding the matter of ambiguity or lack thereof in the instant case with regard to the Debtor being identified as a "Borrower" and whether the determination of same can be made solely from the mortgage document as opposed to all of the documentation involved in the loan, it behooves the Debtor to address the issue of ambiguity in the instant case.

Aleida C. Nunez<br>
Case No: 17-21018-LMI<br>
Page 5

14. It appears that the District Court believed that the term "Borrower" was indeed ambiguous and that therefore the other documents executed simultaneously needed to be utilized in order to define the term "Borrower." As the District Court found the term "Borrower" to be ambiguous, then Parol Evidence should be used to determine the Party's definition of the term "Borrower."  Additionally, contract reformation is an equitable remedy that acts to correct an error not in the parties' agreement but in the writing that constitutes the embodiment of that agreement. It is designed to correct a defective or erroneous instrument so that it reflects the true terms of the agreement that the parties actually reached and, at its essence, allows a judge to reform a written document to match the parties' understanding. The doctrine has evolved such that if a document is to be reformed, it should reflect the true intention of the parties. Florida courts employ this equitable measure in order to preserve the sanctity of the contracting parties' negotiations and the spirit of the deal.

15. Where a contract provision is unambiguous, a court must interpret it as written. Where the provision is ambiguous, meaning subject to more than one possible interpretation, as the District Court believes the term "Borrower" to be in the instant case, then a court may admit parol evidence in order to discern the intent of the parties in drafting the provision. When there are two alternative interpretations of a particular contractual provision, the bankruptcy court should admit relevant parol evidence regarding the parties' intentions in drafting the provisions in question.

Aleida C. Nunez<br>
Case No: 17-21018-LMI<br>
Page 6

16. Under Florida law, reformation of a written contract is appropriate when the contract fails to express the parties' true agreement because of mutual mistake or when one party acts inequitably or fraudulently and causes the counterparty to make a unilateral mistake. *See Smith v. Royal Automotive Group, Inc.*, 675 So. 2d 144, 150 (Fla. 5th DCA 1996); *Belitz v. Riebe*, 495 So. 2d 775, 776 (Fla. 5th DCA 1986) (explaining that "a court will reform a contract if it fails to express the parties' intentions because of fraud, mutual mistake, accident or inequitable conduct"); *Avers v. Thompson*, 536 So. 2d 1151, 1154 (Fla. 1st DCA 1988) (noting that "reformation is proper for unilateral mistake on one side of the transaction, and inequitable conduct on the other"); *Providence Square Assoc. v. Biancardi*, 507 So.2d 1366, 1369 (Fla. 1987) (clarifying that a court "has the power to reform a written instrument where, due to a mutual mistake, the instrument drawn does not accurately express the true intention or agreement of the parties to the instrument"); *Tri-County Produce Distr. Inc. v. Northeast Prod. Cr. Ass'n*, 160 So.2d 46, 50 (Fla. 1st DCA 1963) (same).

17. The Supreme Court of Florida has addressed this issue. In *Providence Square Association, Inc. v. Biancardi*, 507 So.2d 1366 (Fla. 1987), the Supreme Court of Florida, after an exhaustive search into the law of contract reformation, and affirming equitable powers to reform, explained why the law made for good Florida state policy: Notably, in reforming a written instrument, an equity court in no way alters the agreement of the parties. Instead, the reformation only corrects the defective written instrument so that it

accurately reflects the true terms of the agreement actually reached. *Circle Mortg. Corp. v. Kline*, 645 So.2d 75 (Fla. 4th DCA 1994).

18. A reformation relates back to the time the instrument was originally executed and simply corrects the document's language to read as it should have read all along. *Providence Square*, 507 So.2d at 1369-1371. *Providence Square* also instructed that parol evidence, such as oral statements that were made leading up to a writing, may be utilized to support the reformation: Indeed, the general rule in actions at law based on contracts and other written instruments is that ordinarily the writing itself must stand as the only exposition of the parties' intent. In a reformation action in equity, however, parol evidence is admissible for the purpose of demonstrating that the true intent of the parties was something other than that expressed in the written instrument. *Spear v. McDonald*, 67 So.2d 630 (Fla.1953); *Biggs v. Biggs*, 452 So.2d 129 (Fla. 2d DCA 1984); *Rowland v. Whitehead*, 375 So.2d 607 (Fla. 2d DCA 1979). *Providence Square*, 507 So.2d at 1371.

19. Thus, equity decrees the reformation of a writing only when it is established that an agreement exists to which the writing may be made to conform and may not be used to supply an agreement that was never made or to supply material terms or provisions omitted by the parties. Therefore, when courts reform a contract, they must demonstrate that as a matter of equity it was the intent of each party to incorporate the changes. *Davis v. Hinson*, 67 So. 3d 1107 (Fla. 1st DCA 2011). Equitable reformation is essentially a fairness principle—parties to an agreement should be bound to the terms they agreed upon.

20. For instance, if a contract contains a latent ambiguity, extrinsic evidence may be admissible in furtherance of interpreting the contract properly. *See Fi-Evergreen Woods, LLC v. Robinson*, 135 So.3d 331, 336 (Fla. 5th DCA 2013). A latent ambiguity in a contract is not clear from the face of the contract but becomes clear through extrinsic evidence where contractual language is reasonably interpreted in two or more possible ways. *Prime Homes, Inc.*, 84 So.3d at 1152. "A latent ambiguity arises when a contract on its face appears clear and unambiguous, but fails to specify the rights or duties of the parties in certain situations." *Jenkins*, 913 So.2d at 52-53.

21. A patent ambiguity, on the other hand, is an ambiguity on the face of the contract. *Prime Homes, Inc.*, 84 So.3d at 1152. Extrinsic evidence is typically disallowed to interpret a patent ambiguity in a contract because the court is not in the business of rewriting contracts. *Id*. However, even with a patent ambiguity, a court could allow parol evidence to explain the identity, capacity, or relationship of the parties since this evidence does not go to the interpretation or rewriting of the contract. *Id*. Another exception is that parol even may be introduced to establish fraud in the procurement of a written contract. *Ton-Will Enterprises, Inc. v. T&J Losurdo, Inc.*, 440 So.2d 621, 622 (Fla. 2d DCA 1983).

22. In the instant case there was either a mistake or the Debtor was misled into entering into the reverse mortgage with Creditor. The Debtor was on title to the subject property prior to the execution of the reverse mortgage. The agents of the Creditor were negligent in ascertaing that the Debtor and her mother understood the ramifications of entering into the reverse mortgage with Creditor, as the Debtor understood that she and her mother

would be able to live in the property during the Debtor's lifetime without the mortgage coming due as long as the property remained the Debtor's principal residence. As a title owner already, it would appear clear that the Debtor and her mother would not have agreed to endanger the Debtor's homestead absent these assurances.

23. The Debtor has incurred attorney's fees in bringing and prosecuting the instant motion.

**WHEREFORE**, the Debtor requests that this Court enter an Order holding open the instant case pending the decision of the Supreme Court of Florida in the case of *One West Bank, FSB v. Palmero* or in the alternative setting the matter for evidentiary hearing in order to determine whether the Debtor is a Borrower with regard to Reverse Mortgage Solutions or whether the Security Instrument would be void if the Debtor is not a "Borrower" and approving Debtor's Counsel's request for attorney's fees.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed this 2nd day of February, 2021 along with the accompanying **Notice of Hearing**, to **Nancy K. Neidich**, **Esq.**, Chapter 13 Trustee, via NEF, **all registered users of ECF** via NEF, **all creditors** in the attached matrix and **Debtor** in the instant case via regular mail.

/s/Laila S. Gonzalez
FREIRE & GONZALEZ, P.A.
Attorneys for Debtor
Edward Freire, Esq. FBN: 0813771
Laila S. Gonzalez, Esq. FBN: 0975291
Gianny Blanco, Esq., FBN: 0078080
10691 North Kendall Drive, Ste. 207
Miami, FL 33176
Tel: (305) 826-1774
Fax: (305) 826-1794
courtdoc@fgbkc.com